**ORIGINAL**

53

Receipt Number

540955

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| THEODORE NOWAK and GARY BROCKWAY, individually and on behalf of all others similarly situated, | : |
| Plaintiffs, | : |
| vs. | : |
| FORD MOTOR COMPANY, MICKEY POLI-BARTLETT, WILLIAM CLAY FORD, JR., JOSEPH W. LAYMON, DONAT R. LECLAIR, DAVID G. LEITCH, ROMAN J. KRYGIER, and JOHN DOES 1-20, | : |
| Defendants. | : |

Case: 4:06-cv-11718
Assigned To: Gadola, Paul V
Referral Judge: Pepe, Steven D
Filed: 04-07-2006 At 04:46 PM
CMP NOWAK ET AL V FORD MOTOR COMPANY ET AL (EW)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME ACT OF 1974

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Theodore Nowak, a participant in the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees (the "Hourly Plan"), and Plaintiff Gary Brockway, a participant in the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees ("Salaried Plan"; collectively, the "Plans"), on behalf of themselves and all others similarly situated, allege as follows:

## INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plans' fiduciaries, including Ford Motor Company ("Ford" or the "Company"), on behalf of participants in and beneficiaries of the Plans.

2.      The Plans have two main components: (1) a component in which Plan participants make voluntary, pre-tax contributions to the Plans out of their base pay (the "Participant Contribution Component"), and (2) a component in which the Company contributes a portion of the participants' base pay to the Plans (the "Company Contribution Component").[1]  The Company established a Master Trust to permit the commingling of trust assets of several of its employee benefit plans for investment and administrative purposes.[2]

3.      The Master Trust's invested assets consist of Company stock, equity and fixed income mutual funds, equity and fixed income commingled institutional pools and stable value investments. Throughout the Class Period (April 15, 2000 to the present), a Ford Stock Fund, which invested primarily in Ford common stock ("Ford Stock" or "Company Stock"), was

---

[1] Amended agreements for the Plans can be found as Exhibit 4.1 to the Company's SEC S-8 filings of May 10, 2005 and July 25, 2005. See http://www.sec.gov/Archives/edgar/data/37996/000003799604000134/c051004ssipex41.txt and http://www.sec.gov/Archives/edgar/data/37996/000003799605000222/e072205ex41.txt.

[2] Master Trust investment options are mutual funds and other investment products managed by Fidelity Management and Research Company, which is a wholly owned subsidiary of Fidelity Management and Research Corporation. Fidelity Management Trust Company, also a wholly owned subsidiary of Fidelity Management and Research Corporation is the trustee as defined by the Plan. Fidelity Institutional Operations Company, Inc., also a wholly owned subsidiary of Fidelity Management Research Corporation, is the administrator for the Plans. Additionally, Barclays Global Investors and World Asset Management are paid investment management fees by the Company on behalf of the Plans. Fees paid to these entities for trustee, administrative and other fees qualify as related party transactions. Ford Motor Company paid trustee, administrative and other fees, in excess of $5.1 million for the Hourly Plan and Salaried Plan, for the year ended December 30, 2004. See Defendants' SEC Forms 11-K for the FORD MOTOR COMPANY SAVINGS AND STOCK INVESTMENT PLAN FOR SALARIED EMPLOYEES and for the FORD MOTOR COMPANY TAX-EFFICIENT SAVINGS PLAN FOR HOURLY EMPLOYEES, both filed on June 28, 2005.

offered as one of the investment alternatives in the Participant Contribution Component of the Plans. In addition, at various times during the Class Period, a Company Contribution Component of the Plans has been invested in Ford Stock.[3]

4.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period, as is required by ERISA.

5.     Specifically, Plaintiffs allege in Count I that the Defendants breached their fiduciary duties to Plaintiffs in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Ford Stock by continuing to offer Ford Stock as an investment option, making the contribution in Ford Stock, and holding virtually all assets of the Ford Common Stock Fund in Ford Stock, instead of suitable short-term options within the Fund, when the stock was not a prudent investment for participants' retirement savings. In Count II, Plaintiffs allege that Defendants, who communicated with participants regarding the Plans' assets, or had a duty to do so, failed to provide participants with complete and accurate information regarding Ford Stock sufficient to advise participants of the true risks of investing their retirement savings in Ford Stock. In Count III, Plaintiffs allege that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plans' fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count IV, Plaintiffs allege that Defendants breached their duties and

---

[3] According to the Company's 11-K for the Salaried Plan, the Ford Stock Fund consisted of assets from employee contributions (including rollovers), employee loan repayments, exchanges into the fund from other investment options, employer matching contributions (vested and unvested), earnings and dividends. All assets are self-directed. Looking only at results for the year ending December 31, 2004, the net asset value of the Ford Stock Fund decreased, from $6.26 billion to $5.69 billion, with $452 million of the loss *resulting from diminished value of the stock.* Prior to July 1, 2004, unvested employer matching contribution assets *were nonparticipant directed.*

responsibilities to avoid conflicts of interest and serve the interests of the participants in and beneficiaries of the Plans with undivided loyalty. In Count V, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries, in the manner and to the extent set forth in the Count. Finally, in Count VI, Plaintiffs state a claim against Ford for knowing participation in the fiduciary breaches alleged herein.

6.    This action is brought on behalf of the Plans and seeks losses to the Plans, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

7.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial losses, resulting in the depletion of billions of dollars of the retirement savings and anticipated retirement income of the Plans' participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from their fiduciary breaches. The Master Trust held a combined total of approximately $5.693 billion in the Ford Stock Fund, *or 39.1% of total assets in the Master Trust for the Plans,* for the year ending December 31, 2004.

8.    Because Plaintiffs' claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiffs also bring this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

9.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the Counts below.

## JURISDICTION AND VENUE

10.     **Subject Matter Jurisdiction.** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

11.     **Personal Jurisdiction.** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Michigan.

12.     **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

5

## PARTIES

### Plaintiffs

13.     ***Plaintiff Theodore Nowak.***  Theodore Nowak is a participant in the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees.  During the Class Period, as a result of his and/or the Company's contributions, Plaintiff Nowak acquired and held shares of Ford Stock in his individual plan account.

14.     ***Plaintiff Gary Brockway.***  Gary Brockway is a participant in the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees.  During the Class Period, as a result of his and/or the Company's contributions, Plaintiff Brockway acquired and held shares of Ford Stock in his individual plan account.

### Defendants

15.     ***Defendant Ford Motor Company.***  Defendant Ford Motor Company ("Ford" or the "Company") engages in the manufacture and distribution of automobiles, as well as in financing and renting vehicles and equipment. It operates in two sectors, Automotive and Financial Services. The Automotive sector sells cars and trucks. It primarily sells Ford, Lincoln, and Mercury brand vehicles, and related service parts in North America, including the United States, Canada, and Mexico; and Ford-brand vehicles and related service parts in South America. The Automotive sector also sells Ford-brand vehicles and related service parts in Europe and Turkey, as well as in Asia Pacific and Africa.  Throughout the Class Period, Ford's responsibilities included, under the auspices of its Board of Directors, along with other select officers, employees, and committees, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plans and the Plans' assets, as well as the

6

appointment, removal, and, thus, monitoring of other fiduciaries of the Plans that it appointed, or

to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company

exercised discretionary authority with respect to management and administration of the Plans

and/or management and disposition of the Plans' assets.

16.     **Defendant Mickey Poli-Bartlett ("Poli-Bartlett").** According to the Company's

SEC filings for the year ending December 31, 2004, Defendant Poli-Bartlett was Chair of both

the Ford Tax-Efficient Savings Plan for Hourly Employees Committee and the Savings and

Stock Investment Plan for Salaried Employees Committee.

17.     **Defendant William Clay Ford, Jr.** ("William Ford") served as the Chairman of

the Board and Chief Executive Officer of Ford during the Class Period. Defendant William Ford

was a fiduciary within the meaning of ERISA because he exercised discretionary authority or

discretionary control with respect to the appointment of Plan fiduciaries and with respect to the

management of the Plans, he possessed discretionary authority or discretionary responsibility in

the administration of the Plans, and he exercised authority or control with respect to the

management of the Plans' assets.[4]

18.     **Defendant Joseph W. Laymon** ("Laymon") served as Group Vice President of

Corporate Human Resources during the Class Period. Defendant Laymon was a fiduciary within

the meaning of ERISA because he exercised discretionary authority or discretionary control with

respect to the appointment of Plan fiduciaries and with respect to the management of the Plans,

---

[4] Defendants William Ford, Laymon and Krygier are signatories to the Company's Agreement of September 15, 2003 governing Ford's Hourly Plan. In addition, the Company's Plan agreements state that the *Vice President of Human Resources, Vice President of Finance and Treasurer and the General Counsel* shall have the authority, on behalf of the Company, to appoint and remove trustees under the Plans, to approve policies relating to the allocation of contributions and the distribution of assets among trustees, and to approve Plan amendments other than Plan amendments relating to the offering of Company stock as an investment election which amendments *shall be made by the Board of Directors.* See FN 1.

he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

19.      **Defendant Roman J. Krygier** ("Krygier") was Group Vice President of Manufacturing and Quality during the Class Period. Defendant Krygier was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

20.      **Defendant Donat R. Leclair** ("Leclair") was Executive Vice President and Chief Financial Officer during the Class Period. Defendant Leclair was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

21.      **Defendant David G. Leitch** ("Leitch") was Senior Vice President and General Counsel during the Class Period. Defendant Leitch was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

22.      **Committee Member Defendants** ("Committee Defendants"). Upon information and belief, the Defendants appointed a committee of various officers and employees to sit on a Committee that managed the operation and administration of the Plans. These Committee

8

Defendants exercised discretionary authority and discretionary control with respect to the management of the Plans, they possessed discretionary authority or discretionary responsibility in the administration of the Plans, and they exercised authority or control with respect to the management of the Plans' assets.  Additionally, outside of this Committee, decisions regarding the offering of Company stock as an investment election *were made by members of the Board of Directors.* Plaintiffs currently do not know the identity of these Defendants who either acted in their capacity *as Directors engaged in investment elections or served as the Committee Defendants.*  Therefore, such persons are named herein as ***unknown John Doe Defendants 1-20.*** Once the identities of these persons are ascertained, Plaintiffs will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> **All persons who were participants in or beneficiaries of the Plans at any time between April 15, 2000 and the present (the "Class Period") and whose accounts included investments in Ford Stock.**

24.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

25.     **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, over a hundred thousand members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.

9

26.    **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants acted as fiduciaries;

(b)    whether Defendants breached their fiduciary duties to the Plans, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans, and the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans and, therefore, members of the Class have sustained damages and, if so, what is the proper measure of damages.

27.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class because the Plans, as well as the Plaintiffs and the other members of the Class, each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

28.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

29.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

30.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

### A.     Ford Stock Was an Imprudent Investment for the Plans

31.     During the Class Period, Defendants ignored several serious, non-public red flags that should have alerted them to the fact that Ford Stock was not a prudent investment for the Plans.  Moreover, Defendants knew or should have known that Ford's business was not performing nearly as well as had previously been represented to the investing public and to Plan participants and beneficiaries.  Defendants also failed to investigate the questionable business and financial reporting practices that the Company engaged in during the Class Period.

### 1.     The Company's Pension and Healthcare Costs and Accounting

32.     Defendants knew or should have known that Ford has suffered and continues to suffer from rising pension and medical benefit costs.  Initially, the Company sought relief through the intentional underfunding of its healthcare promises. In 2003, the Company underfunded its healthcare promises by as much $3.8 billion, as defendants lowered the plan's health-care inflation rate to 9% in 2003 from 11% in 2002.[5]

---

[5] According to the *Wall Street Journal*, a one-percentage-point decrease reduced Ford's allowance for health-care liabilities by $3.8 billion. See http://online.wsj.com/public/resources/documents/SB109823592801950204.htm.

33.     Ford's pension is also seriously impacted by and relies on unrealistic assumptions, despite the Company's claims that the Company was intent about meeting its pension obligations. Ford has a large, unfunded pension liability that totaled $12.3 billion at year-end 2004. The liability size has remained basically stable for the past year due to the measurement effect of a lower discount rate, despite contributions totaling $2.3 billion during 2004 and favorable investment portfolio returns. More troubling is Ford's massive unfunded retiree medical liability--$32.4 billion at year-end 2004--which has continued to grow, even with the benefit of the new Medicare prescription drug program and substantial direct (i.e., pay-as-you-go) cash expenditures.[6]

34.     Defendants' lowering of assumptions for their healthcare inflation rate and substantial direct payments did little to address the Company's ongoing pension-related problems.  Realizing that U.S. automakers continued to rapidly lose North American market share to foreign competitors, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the union representing the Company's active and retired employees, took an unprecedented step in December 2005, to reduce Ford's healthcare liabilities by as much as $850 million annually.[7] The UAW noted the seriousness of the problems facing the Company as the number of retired workers continued to increase, while the base of active employees at the Company decreased, with 1.25 retired workers for every active employee.[8]

---

[6] See Defendants' SEC Form 8-K filed on April 14, 2005.

[7] See http://sfgate.com/cgi-bin/article.cgi?file=/n/a/2005/12/14/financial/f142700S36.DTL&type=printable.

[8] See http://www.uaw.org/news/uawfordhc.pdf .

12

35.     Moreover, the UAW was deeply concerned about Ford's inability to recapture market share. Ford lost more than $1.4 billion in its North American operations in the first nine months of 2005. In an attempt to press the issue with the Company, the UAW took the unprecedented step of requiring that Ford invest $900 million over five years, into plant improvements and advanced technology initiatives, such as building hybrid and fuel cell vehicles.

## 2.    Declining Bond Ratings and Mass Firings

36.     Defendants knew or should have known that, in the face of the declining sales, staggering pension and healthcare costs, Ford stock was an imprudent investment for the Plans. As early as October of 2004, Standard & Poor's analyst Scott Sprinzen noted with alarm that Ford's $108 billion worth of bonds had achieved the bottom rung of the investment-grade ratings ladder.[9] The Company's auto-loan profits appeared to be at immediate risk, as the U.S. Federal Reserve was expected to raise interest rates. Turning to the Company's automobile manufacturing activities, Ford achieved a pre-tax loss in the second quarter of 2004, as its European luxury-brands unit, which includes the Jaguar and Aston Martin models, lost $362 million. Without improvements in these areas, a negative outlook existed for Ford's investment-grade rating.

37.     In an effort to come to grips with the Company's declining market share and profitability issues, Ford resorted to even more drastic actions. In August 2005, Ford instituted sudden mass firings of its white-collar employees.[10] For the first time in generations, employees were immediately escorted from corporate buildings, as opposed to allowing employees to leave through early retirement or buyouts, or by letting open jobs go unfilled. Forced to aggressively

---

[9] See http://quote.bloomberg.com/apps/news?pid=10000039&cid=gilbert&sid=asCQjCUBbupU.

[10] See http://www.usatoday.com/money/autos/2005-08-15-ford-cuts-usat_x.htm.

achieve its goal of cutting 2,750 of its 35,000 North American white-collar workers, in light of a

$907 million loss in the April-June 2005 period for its North American division, Ford noted that

cuts could go even deeper than the 2,750 positions. The mass firings reflected the cold reality of

a company in decline, as opposed to a traditional economic downturn.

38.     Finally, on January 23, 2006, Ford took the extraordinary step of announcing that

profitability had become the key issue facing the Company and revealed plans for an

unprecedented retrenchment and downsizing of its North American operations:[11]

> DEARBORN, Mich., Jan. 23, 2006 - Ford Motor Company [NYSE: F] today announced details of a comprehensive plan to restore profitability to its automotive business in North America no later than 2008. Ford will apply lessons learned from consumers and the company's successes around the world to strengthen its Ford, Lincoln and Mercury brands and deliver more innovative products while simultaneously reducing costs and improving quality and productivity.
>
> "The automotive market in North America is rapidly becoming as crowded and fragmented as other global markets," said Bill Ford, chairman and CEO. "To meet this challenge, we are acting with speed to strengthen the Ford, Lincoln and Mercury brands, deliver the innovation customers demand and create a business structure for us to compete · and win – in this era of global competition.
>
> "We will be making painful sacrifices to protect Ford's heritage and secure our future," he added. "Going forward, we will be able to deliver more innovative products, better returns for our shareholders and stability in the communities where we operate."
>
> ***
>
> Smaller, Nimbler Organization
>
> Achieving a lean fixed-cost structure and significantly improving Ford's North American assembly capacity utilization are critical components of the Way Forward plan.
>
> "We're now well past the point in which one or two hit products can correct the overcapacity we have or justify the staffing levels we maintain – even with the significant actions we've taken during the past couple of years," Stevens

---

[11] See http://media.ford.com/newsroom/release_display.cfm?release=22382. (Emphasis added.)

said. "Sadly, this isn't just a Ford issue. It's an issue for our domestic competitors, as well.

*"As hard and painful as it is to idle plants and reduce our work force, we know these sacrifices are critical to set the stage for a stronger future,"* she added.

Ford is taking the following new actions to align its capacity with expected demand and to reduce fixed costs:

*14 manufacturing facilities will be idled and cease production by 2012, including a total of seven vehicle assembly plants.*

*Assembly capacity will be reduced by 1.2 million units or 26 percent by the end of 2008.*

A new low-cost manufacturing site is planned for the future.

*Ford will idle the following facilities through 2008:*

*St. Louis Assembly*

*Atlanta Assembly*

*Wixom Assembly*

*Batavia Transmission*

*Windsor Casting (announced following CAW contract negotiations in 2005)*

*Two additional assembly plants, which will be determined later this year*

*In addition, production at St. Thomas Assembly will be reduced to one shift. Facilities operated by Automotive Components Holding LLC are not included in the new announcement.*

*All of these actions will reduce total North American employment by 25,000-30,000 people in the 2006-2012 time period. This is in addition to the previously announced reduction of the equivalent of 4,000 salaried positions in the first quarter of 2006 – or 10 percent of salary-related costs – and a reduction in the company's officer ranks by 12 percent by the end of the first quarter.*

Ford has briefed the leadership of the UAW and CAW about these plans.

Financial Impact

2006 will be a year of transition as Ford moves from its old North American business model to a new customer-focused strategy that is designed to restore automotive operations in the region to profitability no later than 2008. ***The estimated pre-tax financial impact of the North American plan in 2006 includes:***

> ***$250 million for hourly personnel separations – excluding ACH actions.***

> ***$220 million for fixed asset write-offs.***

*"**Our cost structure will improve as we progress through 2006 and increasingly thereafter, and we'll return to profitability in our North American automotive business no later than 2008,**"* said Don Leclair, executive vice president and chief financial officer. "We're confident in our plan and optimistic we can achieve our goals."

***

39.    Having reason to know of the drastic steps the Company planned to downsize its operations and the gross discrepancy between the shortfalls predicted using GAAP versus the U.S. Pension Benefit Guaranty Corp. ("PBGC") accounting measures and practices, Defendants knew or should have known that Ford has manipulated its pension fund accounting to give investors an inaccurate picture of the Company's overall performance. Like most companies, Ford valued its pension assets using "expected" returns rather than actual returns. In light of the Company's historic retrenchment, including Ford's own prediction of losses through 2008, its reliance on methods to inflate returns and underestimate healthcare liabilities throughout the Class Period served to artificially inflate earnings and hide the fact that its true pension liability was seriously under-funded.

### 3.    The Visteon Bailout

40.    Defendants knew or should have known that the Company would eventually be forced to agree to a sweeping bailout of its struggling former parts unit Visteon Corp. This bailout, which Ford announced on May 25, 2005, forced the Company to take back 24 Visteon

plants and 17,400 workers and spend a total of $1.6 billion to $1.8 billion to help Visteon restructure into a smaller company with less U.S. production and more diverse customers.

41.     Following the announced bailout, Ford said that it would take restructuring charges ranging from $450 million to $650 million in 2005 plus additional charges in future years related to the deal.

42.     As part of this bailout, Ford assumed responsibility for the retirement benefits for Visteon's union workers. These are liabilities that will seriously impact Ford and prevent it from returning to profitability for years to come. Indeed, Visteon's pension liabilities currently total $1.14 billion and are under funded to the tune of $270 million, according to company filings with the PBGC.

### 4.     The Dubious Benefits of the Hertz Sale

43.     Defendants also knew or should have known during the Class Period that Ford's sale of The Hertz Corporation ("Hertz") would do little to correct the Company's ongoing structural problems or financial performance. Newsweek writer Allan Sloan initially pointed out in July 2005 that the PBGC was so concerned about Ford's pension and healthcare underfunding that it planned to look at Ford's anticipated sale of Hertz, with an intention to try to get Ford to use its Hertz windfall to strengthen its pension funds.[12] Despite the concerns of the PBGC, Ford did nothing to strengthen its pension and healthcare funding situation, choosing to ignore the PBGC's concerns.

### 5.     Other Red Flags Ignored By the Plan's Fiduciaries

44.     Defendants also ignored several other red flags during the Class Period. Among other things, Defendants knew or should have known during the Class Period that Ford's

---

[12] See http://msnbc.msn.com/id/8358564/site/newsweek/.

declining market share has been artificially propped up for years by heavy incentives, including the offering of "employee pricing" to customers, low "Keep it Simple Plan" pricing, generous cash rebates to buyers and below-market interest rates. The Company's inability to move away from incentives risked the "cheapening" of its brands. Although the Company lowered prices and focused on approaches that emphasized the value of its vehicles, consumers didn't respond and sales sank in October of 2005. Working against Ford's attempts to emphasize value, the Company was forced to recall about 220,000 vehicles from the 2005 model year amid concerns that a battery cable was rubbing against the vehicle frame, potentially causing fires, and that a fuel tank strap could separate after logging tens of thousands of miles. Shares of Ford Stock fell to a new 52-week low after the news.[13]

45.     For these reasons, Defendants should have considered the fact that Ford vehicles suffered from serious defects, causing the recall of thousands of vehicles during the Class Period. Together with the Company's declining market share, pension and healthcare shortfalls, Defendants also should have considered the fact that the Company remains on the verge of a credit downgrade to junk bond status, which will have a huge impact on Ford's borrowing costs.

### 6.     Ford's Ominous Earnings Report

46.     On October 6, 2005, Ford announced staggering pretax worldwide automotive losses in the third quarter of $1.3 billion, compared with a loss of $609 million during the same period a year ago.  In a press release entitled "Ford Reports Third Quarter 2005 Financial Results" the Company stated:

> DEARBORN, Mich., Oct. 20 /PRNewswire-FirstCall/ -- Ford Motor Company
> (NYSE: F) today reported a net loss of 15 cents per share, or $284 million, for the

---

[13] See http://www.aiada.org/article.asp?id=52792.

third quarter of 2005. This compares with net income of 15 cents per share, or $266 million, in the third quarter of 2004.

Ford's third-quarter loss from continuing operations, excluding special items, was 10 cents per share, or $191 million, compared to a profit of 27 cents per share, or $515 million, in the same period last year.*

Ford's total sales and revenue in the third quarter was $40.9 billion, compared to $39.1 billion in the year-ago period.

* Earnings per share from continuing operations excluding special items is calculated on a basis that includes pre-tax profit and provision for taxes and minority interest. See table following "Safe Harbor/Risk Factors" for the nature and amount of these special items and a reconciliation to GAAP.

"As our results indicate, we face many challenges in this competitive and difficult environment," said Chairman and Chief Executive Officer Bill Ford. "We have demonstrated throughout the year that we will continue to take the actions necessary to return our core business to sustainable profitability. We understand the issues, our priorities, and have the right team in place to get the job done."

Third-quarter actions included:

-- Finalization of the Visteon agreement.

-- An agreement to sell The Hertz Corporation.

-- The introduction of new supply base consolidation initiative.

-- Announcement of the Company's innovation initiative, including a

   tenfold increase in annual hybrid vehicle production by 2010.

-- Continued global personnel reductions.

-- The launch of Ford Fusion, Mercury Milan and Lincoln Zephyr in North

   America.

-- Premier Automotive Group reveal of Volvo C70 and Jaguar XK.

-- Roll-out of Ford Focus in Asia Pacific.

The following discussion of the results of our Automotive sector and Automotive business units is on a basis that excludes special items. See table following "Safe Harbor/Risk Factors" for the nature and amount of these special items and a reconciliation to GAAP.

AUTOMOTIVE SECTOR

On a pre-tax basis, worldwide automotive losses in the third quarter were $1.3 billion, a decline of $732 million from a loss of $609 million during the same period a year ago.

Worldwide automotive sales for the third quarter rose to $34.7 billion from $32.8 billion in the same period last year. Worldwide vehicle-unit sales in the quarter were 1,531,000, up from 1,508,000 a year ago.

Total cash, including automotive cash, marketable securities, loaned securities and short-term Voluntary Employee Beneficiary Association (VEBA) assets on September 30, 2005 was $19.6 billion, down from $21.8 billion at the end of the second quarter.

\*\*\*

OUTLOOK

Commenting on the Company's financial outlook, Executive Vice President and Chief Financial Officer Don Leclair said, "We expect the fourth quarter to be another extremely competitive period. Our new products put us in an excellent position to compete in the marketplace. We will continue the turnaround in our operations in Europe, the investment in growth in Asia, and to address our issues in North America."

The Company's 2005 full-year earnings guidance is expected to be at the low end of the current guidance range of $1.00 to $1.25 per share.

\*\*\*

**B.    Defendants Knew Or Should Have Known that Ford Stock was not a Prudent Investment for the Plans.**

47.    At all relevant times, Defendants knew or should have known that Ford was engaged in the questionable business and financial reporting practices detailed above, which made Ford Stock an imprudent investment for the Plans.

48.    Moreover, Defendants failed properly to take into account the numerous practices that put Ford Stock at risk, or the related fact that Ford Stock was inflated in value, when determining the prudence of investing and holding the Plans' assets in Ford Stock.

49.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Ford made to the Plans' participants regarding the Plans' investment in Ford Stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company Stock.

50.    In addition, Defendants failed to adequately review the performance of the other fiduciary Defendants to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.

51.    Defendants failed to conduct an appropriate investigation into whether Ford Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Ford's improper activities so that participants could make informed decisions regarding Ford Stock in the Plans.

52.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Ford Stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary loss, and would have made different investment decisions. Because Defendants knew or should have known that Ford Stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Ford Stock.

53.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Ford Stock; discontinuing further contributions to and/or investment in Ford Stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Ford they could not loyally serve the Plans' participants in connection with the Plans' acquisition and holding of Ford Stock.

54.     Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in Ford Stock.  In fact, the Defendants continued to invest and allow investment of the Plans' assets in Company Stock even as Ford's improper practices came to light.

**C.     Defendants Regularly Communicated with the Plans' Participants Concerning Purchases of Ford Stock, Yet Failed to Disclose the Imprudence of Investment in Ford Stock.**

55.     Defendants regularly communicated with employees, including the Plans' participants, about Ford performance, future financial and business prospects, and Company Stock. During the Class Period, the Company fostered a positive attitude toward Ford Stock as an investment for the Plans, and/or allowed the Plans' participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in Ford Stock. As such, the Plans' participants could not appreciate the true risks presented by investments in Ford Stock and therefore could not make informed decisions regarding investments in the Plans.

## THE LAW UNDER ERISA

56.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

57.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

58.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

59.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things,

a.      The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Ford Stock Fund which invested in Ford Stock, to ensure that each investment is a suitable option for the Plans.

b.      A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plans' sponsor.

c.      A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

60.      ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

61.      Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

62.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. The Defendants all had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets, and had discretionary authority or responsibility for the administration of the Plans.

63.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

64.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).

65.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

66.     The Plans and their assets are administered and managed by the Defendants, along with several other unnamed fiduciaries who served on the Committee or Committees that administered and managed the Plans.

67.     During the Class Period, Defendants' direct and indirect communications with the Plans' participants included statements regarding investments in Company Stock.  Upon

information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plans' participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

68.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## THE PLANS

69.     The Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees and the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees (defined above as the "Plans") are defined contribution profit sharing plans, with a 401(k) feature, with separate accounts maintained for each participant. The Plans are subject to the provisions of ERISA.

70.     The Plans are legal entities that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither plaintiff nor defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans. Stated differently, in this action, Plaintiffs, who are described above, seek relief that is inherently "plan-wide."

**A.     Ford Motor Company Savings and Stock Investment Plan for Salaried Employees.**

71.     Ford established the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees (defined above as the "Salaried Plan"), a defined contribution plan. Eligible employees may participate in and make After-Tax Contributions or Pre-Tax Contributions under

26

the Salaried Plan as of the first day of the second calendar month immediately following such Employee's original date of hire. Eligibility is restricted to employees of Ford who are not included in a unit of Employees covered by a negotiated collective bargaining agreement which does not provide for participation in the Salaried Plan, absent approval of the Company and receipt of a waiver from the involved labor organization, of all rights of and claims of right by such labor organization to bargain collectively with respect to the Salaried Plan. Nor can a "leased employee", meaning any person who is not an employee who provides services to the Company, participate.

72. Pursuant to ERISA the Company is designated as the sole named fiduciary, delegating its authority to control and manage the operation and administration of the Plan to its Board of Directors, Company Officers and other designees. The Group Vice President of Corporate Human Resources, Vice President of Finance and Treasurer and the General Counsel of the Company are delegated the authority to appoint and remove Trustees and investment advisors under the Salaried Plan, to approve policies relating to the allocation of contributions and the distribution of assets among Trustees and investment advisors, to approve Salaried Plan amendments and to modify the Salaried Plan or suspend the operation of any provisions of the Salaried Plan; provided, however, only the Board of Directors shall have authority to amend provisions relating to the extent of Company Matching Contributions and the offering of Company Stock as an investment election.

73. Each Eligible Employee may elect to contribute to the Salaried Plan for each pay period any combination of After-Tax or Pre-Tax Contributions of up to fifty percent (50%) of the Employee's Salary for the pay period. The payroll deduction for these Contributions authorized by an Employee may be increased, decreased or stopped by him or her only as of the first or

sixteenth day of any month by providing in such form and in such manner and at such time as the Administration Committee shall specify a notice of such change. If an Employee shall become ineligible to make Contributions to the Salaried Plan, the Employee's payroll deduction authorization shall immediately terminate.

74.     Company matching contributions may be allocated to the Accounts of Eligible Employees each pay period in an amount not to exceed 60% of the aggregate amount of After-Tax Contributions and Salary reductions made by Eligible Employees who have been employed by one or more Participating Employers for at least twelve (12) months following such Employees' original dates of hire. Employees are required to complete a Salary Reduction Agreement in such form and in such manner and at such time as the Salaried Plan's Administration Committee may prescribe.

75.     Participants may elect a number of investment options, including the Ford Stock Fund. This fund is invested primarily in shares of Company Stock, with a small portion of the Fund invested in cash or cash equivalent or other short-term investments, to provide liquidity for daily activity. Participants shall have no ownership in any particular asset of the Ford Stock Fund. The Trustee shall be the sole owner of all Ford Stock Fund assets. Proportionate interests in the Ford Stock Fund shall be expressed in Ford Stock Fund Units. All Ford Stock Fund Units shall be of equal value and no Ford Stock Fund Unit shall have priority or preference over any other. Ford Stock Fund Units shall be credited by the Trustee to Accounts of Participants as of each valuation date.

76.     A Common Stock Index Fund is also provided, with the objective of providing investment results that closely correspond to the price and yield performance of the publicly traded Company Stocks (i) of the 500 corporations included in Standard and Poor's 500 Index

28

and (ii) of the corporations having capitalizations of at least $100 million as publicly reported from time to time and not included in the Standard and Poor's 500 Index. Assets shall be invested in the Company Stock of each of such corporations in the same percentage weighting as the capitalization of such corporation is as a percentage of the total of the capitalizations of all of such corporations.

77.     A Bond Index Fund is also provided, with the objective of achieving investment results that closely correspond to the price and yield performance of the Lehman Brothers Aggregate Bond Index (the "Lehman Aggregate Index"). Assets are invested in a portfolio of Treasury notes and bonds, corporate notes and bonds and mortgage-backed securities and other securities that, in the aggregate, typify the securities that are included in the Lehman Aggregate Index.

78.     An Interest Income Fund is also provided, with the objective of achieving a broadly diversified, stable value investment in which the value of the Participant's investment does not fluctuate except for the addition of interest credited to the Participant's Account. The interest rate payable on assets in the Interest Income Fund is declared annually in advance and may be changed each calendar year.

79.     Mutual Funds are also offered, each described in accordance with a prospectus, provided to each Participant of the Salaried Plan who requests such prospectus.

**B.     Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees.**

80.     Ford established The Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees (defined above as the "Hourly Plan"), a defined contribution plan. The plan is a product of a collective bargaining agreement between the Company and the UAW.  Generally,

hourly-rate employees may elect to participate in the Hourly Plan three months after such employee's initial date of hire ("eligibility date").

81.     Pursuant to ERISA, the Company is designated as the sole named fiduciary, delegating its authority to control and manage the operation and administration of the Hourly Plan to its Board of Directors, Company Officers and other designees. The Group Vice President of Corporate Human Resources, Vice President of Finance and Treasurer and the General Counsel of the Company are delegated the authority to appoint and remove Trustees and investment advisors under the Hourly Plan, to approve policies relating to the allocation of contributions and the distribution of assets among Trustees and investment advisors, to approve Hourly Plan amendments and to modify the Hourly Plan or suspend the operation of any provisions of the Hourly Plan; provided, however, only the Board of Directors shall have authority to amend provisions relating to the extent of Company Matching Contributions and the offering of Company Stock as an investment election.

82.     Each eligible employee may make a Tax-Efficient Savings election in such form and in such manner and at such time as the Hourly Plan's Committee may prescribe, to have contributed to the Hourly Plan on his or her behalf:

(a)     for each pay period, a Tax-Efficient Savings Contribution in such amount as he or she may authorize at a rate of not less than one percent nor more than twenty (20) percent for the period following the first pay period after January 1, 1997 through the first pay period after January 1, 1998, twenty-five (25) percent through March 31, 2002, forty (40) percent from April 1, 2002 through the end of the pay period including March 31, 2004, and fifty (50) percent following the first pay period after April 1, 2004 and thereafter in increments of one

percent, of his or her wages for such pay period, such amounts to be rounded down to the nearest full dollar, and

(b)    for each profit sharing distribution, a Tax-Efficient Savings Contribution in such amount as he or she may authorize at a rate of not less than one percent nor more than 100 percent, in increments of one percent, of such profit sharing distribution.

83.    In turn, the Company may contribute to the Hourly Plan each pay period, out of current or accumulated earnings and profits, an amount equal to the aggregate of the amounts of Tax-Efficient Savings Contributions to be contributed by the Company on behalf of employees pursuant to such employees' elections under Tax-Efficient Savings agreements with respect to such pay period. An employee may also elect to make after-tax savings contributions, with such contributions allocated to the employee's After-Tax Savings Account.

84.    The Company's investment options for hourly employees under the Hourly Plan are substantially similar to those available to the Company's salaried workers under the Salaried Plan. These options include elections to invest in the Ford Stock Fund, the Common Stock Index Fund, the Bond Index Fund, the Interest Income Fund, and available Mutual Funds.

## CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

85.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

86.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

87.     As alleged above, the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plans' investment options, including the option of Company Stock.

88.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plans' assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in Ford Stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

89.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

90.     The Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period, these Defendants knew or should have known that Ford Stock was not a suitable and appropriate investment for the Plans as described herein. Investment in Ford Stock during the Class Period clearly did not serve the Plans' purposes of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' savings. Despite all of this, these fiduciaries continued to offer the Ford Stock as an investment

option for the Plans and to direct and approve the investment of the Ford Common Stock Fund in Ford Stock, instead of cash or other investments. Similarly, at times during the Class Period, these fiduciaries permitted Company matching contributions to be made in Ford Stock. In so doing, Defendants further breached their fiduciary duties.

91.     Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take *any meaningful* steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investment in Ford Stock and the Company's matching contributions in Ford Stock. Further, given that such a high concentration of the assets of the Plans were invested in the stock of a single company – Ford – and because Company matching contributions were required to be invested primarily in the Ford Stock, Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

92.     Moreover, the fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

93.     The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal the failure to prudently and loyally manage the Plans' assets with respect to offering Company Stock as an investment option in the Plans; providing the Company matching contributions in Ford Stock, despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage the Plans' assets with respect to the Plans' investments, including the match, as a result

of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

94.     Specifically, at least some of the Defendants had actual knowledge of the Company's corporate malfeasance and questionable reporting and business practices and/or constructive knowledge of these activities due to their high-ranking positions at the Company. Despite this knowledge, they participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing participants that the Plans' holdings of Ford Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plans' investment in Ford Stock, despite inarguably having knowledge of such breaches.

95.     Furthermore, through their own failure to prudently and loyally manage the Plans' investment in Ford Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plans' investment in Ford Stock.

96.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their investments meant to help participants save for retirement. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

97.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

98.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

99.     As alleged above, the scope of the Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to participants regarding the Plans and assets of the Plans. In addition, the Defendants had a duty to provide participants with information they possessed that they knew or should have known would have an extreme impact on the Plans.

100.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options, such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including investment in the Ford Common Stock Fund.

101.    Because a substantial percentage of the Plans' assets were invested in Ford Stock, and Defendants chose to invest the Ford Common Stock Fund overwhelmingly in Ford Stock, such investment carried with it an inherently high degree of risk. This inherent risk made the

Defendants' duty to provide complete and accurate information particularly important with respect to Ford Stock and the Ford Common Stock Fund.

102.   The Defendants named in this Count breached their duty to inform participants by failing to provide complete and accurate information regarding Ford Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Ford Stock and the prudence of investing retirement contributions in the stock.

103.   With respect to the Company and certain other fiduciary Defendants, upon information and belief, such communications were disseminated directly to *all* participants, including the Prospectuses, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports. In addition, upon information and belief, the Company communicated directly with *all* participants regarding the merits of investing in Ford Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Ford Stock as required by ERISA.

104.   These failures were particularly devastating to the Plans and the participants, as a significant percentage of the Plans' assets was invested in Ford Stock during the Class Period, and, thus, the stock's precipitous decline had an enormous impact on the value of participants' retirement assets.

105.   In addition, Ford and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of Ford would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide participants with this crucial information.

106.   As a consequence of the failure of the Defendants named in this Count to satisfy their disclosure obligations under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Ford Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by participants, that Ford Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, participants could have protected themselves against losses accordingly, and consequently, participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

107.   As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses.   If the Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.   Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

108.   Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

**Failure to Monitor Appointed Plan Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Defendants)**

109.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

110.    At all relevant times, as alleged above, Ford and the other Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, as alleged above, the scope of the fiduciary responsibility of Ford and the other Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, Ford and the other Defendants named in this Count, had the duty to:

(1)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, as noted above, and the behavior of the Plans' participants;

(2)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(3)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(4)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(6)    Ensure that the appointed Plan fiduciaries report regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

111.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of Plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

112.   Ford and the other Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.  Ford and the other Defendants named in this Count knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the Ford Common Stock Fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plans in Ford Stock when it no longer was prudent to do so.  Despite this knowledge, Ford and the other Defendants named in this Count failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

113.    In addition, Ford and the other Defendants named in this Count, in connection with their monitoring and oversight duties, were required to disclose to appointed Plan fiduciaries accurate information about the financial condition of Ford that they knew or should have known, that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

114.    Ford and the other Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

115.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their investments meant to help participants save for retirement.

116.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of**
**ERISA §§ 404 and 405 by all Defendants)**

117.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

119.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

120.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plans and their participants. These conflicts of interest put these Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and stockholders), and the interests of the Plans' participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

121.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the Ford Stock; failing to notify appropriate federal agencies, including the SEC and the Department of Labor, of the facts and transactions which made Ford Stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

122.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by

their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA § 405 by Ford, the Individual Defendants and the Committee Member Defendants)

123.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

124.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to

any liability which he may have under any other provision, for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly

in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such

act or omission is a breach; (b) he fails to comply with §1104(a)(1) in the administration of his

specific responsibilities which give rise to his status as a fiduciary, by enabling such other

fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless

he makes reasonable efforts under the circumstances to remedy the breach.

125.    As alleged herein, Ford and the other Defendants named in this Count, through its

officers and employees, withheld material information from the market and provided the market

with misleading disclosures, by the conduct set forth above, and profited from such practices,

and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In

addition, as alleged herein on information and belief, all Defendants participated in and/or knew

about the Company's misrepresentations about and problems with the pension accounting. Thus,

42

these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Ford Stock as an investment for the participants' retirement assets.

126.   Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of Ford Stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in Ford Stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Ford Stock, despite knowing such failures were breaches of fiduciary duties under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(1)(C).

127.   In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of Ford' problems and further concealing such practices from participants and the market as a whole.

128.   In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants – including any appointed Plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plans caused by the Company's improper practices, so that these other

Defendants could effectively discharge their obligation to prudently and loyally manage the Plans' investment in Ford Stock. In so doing, these Defendants breached ERISA § 405(a)(1)(B).

129.    Further, through their failure to properly and effectively monitor their appointees, including those serving as appointed Plan fiduciaries, and remove those whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed Plan fiduciaries' imprudent management of the Ford Stock in the Plans.

130.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

131.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT VI**
**Knowing Participation in a Breach of Fiduciary Duty**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 502(a)(3) by Ford)**

132.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    To the extent that Ford is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Ford knowingly participated in the breaches of duties by those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

134.    Ford benefited from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by the Plans by contributing Ford Stock to the

Plans while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Ford providing the market with materially misleading statements and omissions. Accordingly, Ford may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Ford Stock which would have been contributed to the Plans, but for Ford's participation in the foregoing breaches of fiduciary duty.

<b>CAUSATION</b>

135. The Plans suffered billions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Ford Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses to the Plans were reflected in the diminished account balances of the Plans' participants.

136. Defendants are responsible for losses caused by the participants' direction of investment in Ford Stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Ford Stock, and Defendants remain liable under ERISA for losses caused by such investment.

137. Defendants are also responsible for all losses caused by the investment of the Plans' Company contributions in the Ford Stock Fund and/or Ford Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

138.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Ford Stock, eliminating Ford Stock as an investment alternative when it became imprudent, and divesting the Plans from its holdings of Ford Stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

139.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Ford Stock during the Class Period.  As a consequence of the Defendants' breaches, the Plans suffered significant losses.

140.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

141.    With respect to calculation of the losses to a plan, breaches of fiduciary duties result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

46

142.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the

form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans

resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3)

reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the

common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts,

as provided by law; and (6) such other legal or equitable relief as may be just and proper.

143.    Under ERISA, each Defendant is jointly and severally liable for the losses

suffered by the Plans in this case.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

144.    ERISA § 404(c) is an affirmative defense that provides a limited exception to

fiduciary liability for losses that result from participants' exercise of control over investment

decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control"

over investment decisions, and the fiduciaries must otherwise satisfy the procedural and

substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations

promulgated under it.

145.    Those provisions were not complied with here as, among other reasons, instead of

taking the necessary steps to ensure effective participant control by completely and accurately

disclosing material information, the Defendants did exactly the opposite. As a consequence,

participants in the Plans did not have informed control over the portion of the Plans' assets that

were invested in Ford Stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

146. Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, the Plaintiffs and the Class for relief stemming from participants' decisions to invest contributions in Ford Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

147. Furthermore, under ERISA, *fiduciaries* – not participants – exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffers a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans.

148. Finally, Defendants remain liable for Plan losses that pertain to Ford Stock acquired by the Plans with *employer* contributions as participants did not exercise any control.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A. A Declaration that each of the Defendants has breached its ERISA fiduciary duties to the participants of the Plans;

B. A Declaration that each of the Defendants is not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.     An Order enjoining each of the Defendants from any further violations of its ERISA fiduciary obligations;

F.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Ford Stock;

G.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the individual accounts of the participants of the Plans in proportion to the accounts' losses;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

49

Dated: April 7, 2006

Respectfully submitted,

E. POWELL MILLER
DAVID H. FINK
JAYSON E. BLAKE
**MILLER SHEA, P.C.**
Miller Shea Building
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

**SCOTT + SCOTT, LLC**
DAVID R. SCOTT
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
              -and-
**SCOTT + SCOTT, LLC**
GEOFFREY M. JOHNSON
33 River Street
Chagrin Falls, OH 44022
Telephone:  (440) 247-8200
Facsimile:  (440) 247-8275

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
STEVEN G. SCHULMAN
LORI G. FELDMAN
ARVIND KHURANA
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229