UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In re FORD MOTOR COMPANY                    Consolidated Cases
ERISA LITIGATION                            Master Case No. 06-11718

                                            DISTRICT JUDGE PAUL V. GADOLA
                                            MAGISTRATE JUDGE STEVEN D. PEPE


_____/

## REPORT AND RECOMMENDATION DENYING
## DEFENDANTS' MOTION TO DISMISS (DKT. #73)

This is a consolidated Employee Retirement Income Security Act of 1974 ("ERISA")

case brought by certain salaried and hourly Ford employees against Ford Motor Company and

various fiduciaries of the Ford 401(k) plans.  While not yet certified as a class action under Fed.

R. Civ. P. 23(b)(3), this Court previously selected lead and liaison counsel under Rule 23(g)(2)

because of the inability of the Plaintiffs to agree on such counsel and for efficient management

of this action (Dkt. #59 & #60).  The parties subsequently submitted a stipulated scheduling

order (Dkt. #69) requiring that Plaintiffs file a Consolidated Class Action Complaint

("Complaint") on or before April 30, 2007 (Dkt. #70 & #71), and that Defendants answer or

otherwise respond to the Complaint on or before June 29, 2007.  Accordingly, Defendants filed a

motion to dismiss on June 29, 2007 (Dkt. #73), which Plaintiffs filed a 40 page response to on

August 14, 2007 (Dkt. #76).  Defendants filed their 20 page reply on September 14, 2007 (Dkt.

#77).  Defendants' motion to dismiss was referred for report and recommendation pursuant to 28

U.S.C. § 636 (b)(1)(B) (Dkt. #75).  On March 4, 2008, a hearing was held on Defendants'

motion at which time all unresolved issues were addressed. For the reasons indicated below, **IT IS RECOMMENDED** that Defendants' motion to dismiss be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The 95 page, 293 paragraph Complaint filed against Ford Motor Company ("Ford" or the "Company"), certain officers and directors of the Company, and other fiduciaries of the 401(k) retirement savings plans established and sponsored by Ford as a benefit for its employees, including the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees (the "TESPHE") and the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees (the "SSIP") (collectively, the "Plans") allege that from April 15, 2000, to the present (the "Class Period") Defendants breached their fiduciary duties under ERISA, in six principal ways:

> (1) selecting and maintaining Ford Motor Company stock as an investment for the Plans when it was no longer a suitable or prudent investment option;
>
> (2) encouraging participants in the Plans to invest in Ford Motor Company common stock;
>
> (3) continuing to invest Company contributions in Ford Motor Company common stock and failing to divest the Plans from shares in Ford common stock at a time when that investment option became imprudent due to the poor financial and operating performance of the Company;
>
> (4) abdicating their continuing duty to review, evaluate and monitor the suitability of the Plans' investment in Ford Motor Company common stock;
>
> (5) failing to provide accurate, material information to enable the Plans' participants to make informed investment decisions concerning their contributions invested in Ford Motor Company common stock; and
>
> (6) failing to monitor others of the Plans' fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plans and their investments.

Plaintiffs seek relief pursuant to §409 and §502 of ERISA, 29 U.S.C. §§1109, 1132, on behalf of all participants in or beneficiaries of the Plans who sustained losses in their retirement accounts.

## A.    The Ford Plans

The Plans are intended to be 401(k) defined contribution plans under the Internal Revenue Code (Compl. ¶¶ 1, 23).  Ford established the Plans to assist its employees in systematically saving and investing for retirement, and to "provide them with an opportunity to become stockholders of the Company" (SSIP Plan Document, as amended effective through April 13, 2006, attached to Compl. as Exhibit ("Ex.") B, Ford-ER00085 ("2006 SSIP Plan Document"); TESPHE Plan Document, as effective on September 15, 2003, attached to Compl. as Ex. C, Ford-ER00001, Ford-ER00004 ("2003 TESPHE Plan Document")).  The Plans supplement the principal retirement benefits Ford provides to its employees through two qualified defined benefit plans: the Ford-UAW Retirement Plan, which covers hourly employees represented by the United Autoworkers Union ("UAW"), and the General Retirement Plan, which covers substantially all other Ford employees in the United States hired on or before December 31, 2004 (*See* Ford Motor Company, Annual Report, Form 10K, Note 22 (filed Feb. 28, 2007), *available at* http://www.sec.gov/edgar/searchedgar/companysearch.html (file number 001-03950)).[1]

---

[1] Although not applicable to the named Plaintiffs, Ford also maintains a primary defined contribution retirement plan - the Ford Retirement Plan - for Ford employees hired or rehired on or after January 1, 2004 (*See* Ford Motor Company, Annual Report, Form 10K, Note 23 (filed March 1, 2006), *available at* http://www.sec.gov/edgar/searchedgar/companysearch.html (file number 001-03950)).

The SSIP allows eligible employees to make pre-tax and after-tax contributions to the Plan, provided that those contributions in aggregate do not exceed fifty-percent of the employee's salary for the relevant pay period, subject to limitations based on the employee's compensation and applicable federal laws (2006 SSIP Plan Document, Article III, §§ 3.1(a)-(b), 3.4(a)-(e), Ford ER00095-96, Ford-ER00100-105). For most of the putative class period, Ford also made matching contributions to the SSIP for the benefit of participants, subject to the Plan's provisions (2006 SSIP Plan Document, Article III, § 3.1(d)).

The TESPHE allows hourly employees to contribute to either the Tax-Efficient Savings Account or the After-Tax Savings Account within the Plan (2003 TESPHE Plan Document, Article IV, §§ 1-3, Ford-ER00009-11). The TESPHE is similar in many respects to the SSIP; pertinent differences include that participants in the TESPHE are limited to hourly employees and Ford has not made matching contributions during the Class Period (Compl. ¶¶ 36-43). Like the SSIP, TESPHE participants may contribute no more than fifty percent of their salary per pay period, subject to additional limitations based on the employee's compensation and applicable laws (2003 TESPHE Plan Document, Article IV, § 4(b), Ford-ER00013).

Participants in either Plan may invest their contributions in one or more of dozens of investment options specified in each Plan Document, including the Ford Stock Fund, the Common Stock Index Fund, the Bond Index Fund, the Interest Income Fund and a large number of mutual funds and other investment funds with a range of risk and return characteristics (2006 SSIP Plan Document, Article IV, § 4.1, Ford-ER00108; 2003 TESPHE Plan Document, Article

VII, Ford-ER00018).[2]  Participants may transfer assets within their accounts to different

investment options at any time with the exception that transfers into the Ford Stock Fund in the

SSIP are limited to five transfers per month (2006 SSIP Plan Document, Article IV, § 4.2(a),

Ford-ER00109).[3]  The Plans are intended to comply with ERISA Section 404(c), 29 U.S.C. §

1104(c).[4]

On or before April 13, 2006, the SSIP provided that the Ford Stock Fund "shall be

invested primarily in shares of Company Stock" and that

> For each participant who elects . . . to have contributions invested in the
> Ford Stock Fund . . . , the Trustee shall invest the sums so to be invested
> . . . in accordance with instructions of a person, company, corporation or
> other organization appointed by the Company.

(SSIP Plan Document, as amended effective through April 1, 2004, attached to Compl. as Ex. A,

Article VIII, § 8.1(a), Ford-ER00722 ("2004 SSIP Plan Document").  Similarly, on or before

---

[2] From 1999 to 2001 and from 2004 to 2005, Ford made matching contributions to SSIP
Plan participants' accounts in Ford stock through the Ford Stock Fund.  Originally, participants
were prevented from transferring matching contributions from the Ford Stock Fund to other
investment options in the SSIP.  This restriction was removed when matching was reinstated in
2004 (Compl. ¶¶ 25-35).

[3] From June 1, 2000, to December 1, 2004, Plan participants were limited to five transfers
per month into or out of the Ford Stock Fund (*See* 2006 SSIP Plan Document, Article IV, §
4.2(a), Ford-ER00109; 2006 Amendments to TESPHE, attached to Compl. as Ex. E, Ford-
ER00071).

[4] *See* 2007 SSIP Summary Plan Description, Ford-ER00943, Dkt. #73, Ex. A ("The Plan
is intended to constitute a plan as described in Section 404(c) of the Employee Retirement
Income Security Act (ERISA) of 1974, as amended, and Title 29 of the Code of Federal
Regulations Section 2550.404c-1, and the fiduciaries of the Plan may be relieved of the liability
of any losses which are the direct and necessary result of investment instructions given by a
participant or beneficiary."); 2004 TESPHE Summary Plan Description, Ford-ER00244, Dkt.
#73, Ex. B ("The TESPHE is intended to constitute a plan described in section 404(c) of ERISA.
The fiduciaries of the TESPHE are relieved of inability for any losses which are the direct and
necessary result of investment instructions given by members of the TESPHE.").

April 6, 2006, the TESPHE provided that one of the investment options available to participants is the Ford Stock Fund, and investments in which "shall be made primarily in Company Stock." (2003 TESPHE Plan Document, Article XIII, § 1(a), Ford-ER00029).

Ford, in its capacity as settlor, amended various provisions of the Plans throughout the putative class period, and continued to permit the Plans' assets to be invested in the Ford Stock Fund. In 2006, Ford amended the Plans' Documents to affirm its objective to offer the Ford Stock Fund to Ford employees (2006 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00130 ("It is the Company's intent that to the fullest extent permitted by ERISA, that the Ford Stock Fund be a permanent feature of the Plan[.]"); Amendments to the SSIP and TESPHE dated April 13, 2006, attached to Compl. as Ex. E, Ford-ER00069 (same) ("April 13, 2006, Amendments"); Amendments to TESPHE dated April 6, 2006, attached to Compl. as Ex. D, Ford-ER00422 ("April 6, 2006, Amendments"). The 2006 Plan Documents provide that the Ford Stock Fund constitutes employee stock ownerships plans ("ESOPs") under ERISA Section 407(d)(6), 29 U.S.C. § 1107(d)(6)(A), and require the assets of the Ford Stock Fund to be invested exclusively in Ford stock, except for a small percentage invested in cash or cash equivalents to provide liquidity for daily activity (2006 SSIP Plan Document, Article, VIII, § 8.1(a), Ford-ER00130; April 13, 2006, Amendments, Ford-ER00067-69; April 6, 2006, Amendments, Ford-ER00422).

On April 13, 2006, Ford also amended the Plans to provide for the appointment of an independent fiduciary, entirely unrelated to Ford, with respect to the Ford Stock Fund (Compl. ¶ 195). The amendments directed the independent fiduciary to invest the assets of the Ford Stock Fund "exclusively in Company Stock" unless the fiduciary determines "from reliable public information that there is serious question concerning the Company's short term viability as a

going concern." (*Id.* citing Ford-ER00069). The independent fiduciary has made no such determination and therefore the assets of the Ford Stock Fund continue to be invested in Ford stock under its stewardship.

### B. The Parties

The lead Plaintiffs in this action are David Cooper ("Cooper") and Mark Ousachi ("Ousachi") (collectively, the "Plaintiffs"). Cooper is a current employee of Ford and has been since 1986, and is a participant in the SSIP (Compl. ¶ 14). Ousachi was employed by Ford from May 2000 to December 2003 and was a participant in the SSIP during his employment. *Id.* at ¶ 15. Neither of the Plaintiffs was or is a participant in the TESPHE. *See Id.* at ¶¶ 14-15.

The Complaint identifies distinct groups of fiduciaries of the Plans and describes their fiduciary duties based on the Plans' Documents. *Id.* at ¶¶ 44-99. Defendants do not challenge their fiduciary status in their motion. The following are the groups of Defendants:

Ford is responsible for administering the Plans. It is responsible for selecting the investment alternatives offered by the Plans, including the Ford Stock Fund, and thus exercises fiduciary discretion and authority in this regard. *Id.* at ¶¶ 51-68.

The "Executive Officer Defendants," comprised of the Chief Operating Officer, Chief of Staff, and the Vice Chairman from time to time of Ford, determine whether to make matching contributions under the Salaried Plan and the amount of such contributions. *Id.* at ¶ 70.

The "VP Defendants" are eight known current and former officers and an unknown number of unknown current and former officers of Ford, as set forth in ¶ 17 of the Complaint. Under the Salaried Plan they are responsible for appointing, renewing, and removing trustees and investment advisors, approving policies relating to the allocation of contributions and the distribution of assets among trustees and investment advisors, approving Plan amendments not related to matching contributions, modification of the Salaried Plan, and suspension of the operation of any provisions of the SSIP. *Id.* at ¶ 72. They have substantially similar duties under TESPHE. *Id.* at ¶¶ 77-80.

The "IPC Defendants" are comprised of designated officers of Ford who are

members of the "Investment Process Committees" under the Plans. With respect to the SSIP, the IPC Defendants recommended investment process guidelines that included the investment options to be offered under the SSIP, including the Ford Stock Fund. *Id*. at ¶¶ 82-87. An "Investment Process Committee" was instituted for the Hourly Plan during the Class Period, with duties similar to that of the Investment Process Committee for the Salaried Plan. *Id*. at ¶¶ 88-91.

The "IPOC Defendants" are comprised of designated officers of Ford who are members of the "Investment Process Oversight Committee" ("IPOC") under the Plans. The IPOC Defendants are charged with reviewing the performance of the investment options under the Plans and considering any recommendations from the respective Investment Process Committees. *Id*. at ¶¶ 93-98.

The "Doe Defendants" are fiduciaries of the Plans during the Class Period whose identities are unknown to Plaintiffs. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

C.     The Claims

Count I alleges that all Defendants failed to prudently and loyally manage the Plans and assets of the Plans, in violation of ERISA, by (a) continuing to offer Ford stock as an investment option for participant contributions under the Plans and (b) for both employee and employer contributions to the Ford Stock Fund, continuing to invest the assets of the Ford Stock Fund in Ford stock rather than in cash or other short-term investment options, while they knew or should have known that Ford stock no longer was a prudent investment for participants' retirement savings. *Id*. at ¶¶ 234-52.

Count II alleges that Ford, the VP Defendants and the Doe Defendants who appointed the members of the IPOC, all of whom had the responsibility to appoint, and remove, and thus monitor the performance of other fiduciaries, breached their fiduciary duty by (a) failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent actions and inactions with respect to Ford stock; (b) failing to ensure that the

monitored fiduciaries appreciated the true extent of Ford's highly risky and inappropriate business and accounting practices and the likely impact of such practices on the value of the Plans' investment in Ford stock; (c) to the extent appointees lacked such information, failing to provide complete and accurate information to them such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees who performed inadequately by continuing to make and maintain investments in Ford stock, despite their knowledge of circumstances that rendered Ford stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA. *Id.* at ¶¶ 253-62.

Count III alleges co-fiduciary liability against all Defendants, for knowing of the breaches set forth in Counts I and II, yet participating knowingly in them, enabling them and failing to remedy them. *Id.* at ¶¶ 263-74.

Plaintiffs allege that the Plans have lost over six billion dollars as a result of their continued investment in Ford stock during the Class Period. *Id.* at ¶¶ 35, 43, 192. Among other relief, Plaintiffs seeks an order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' alleged breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations.

## II.    STANDARD OF REVIEW

Fed. R. Civ. P 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as

a matter of law, the plaintiff is entitled to legal relief even in everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ----, 127 S.Ct. 1955, 1965 (2007), *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," *Twombly*, 127 S.Ct. at 1965 (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

"However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Natural Res., Inc. V. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1994). "In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *In re DeLorean*, 991 F.2d 1236, 1240 (6th Cir. 1993) (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc*., 859 F.2d 434, 436 (6th Cir.1988)). *See also, Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987) (liberal Rule 12(b)(6) review is not afforded legal conclusions and unwarranted factual inferences); *Ana Leon T. v. Federal Reserve Bank*, 823 F.2d 928, 930 (6th Cir. 1987) (*per curiam*) (mere conclusions are not afforded liberal Rule 12(b)(6) review).

*Conley v. Gibson*, 355 U.S. 41, 46 (1957), spoke of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Emphasis supplied.). *Twombly*, notes that under a "literal reading of *Conley's* 'no set of facts' standard, a wholly conclusory statement of claim would survive a motion to dismiss whenever

the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 127 S.Ct. at 1968. *Twombly*, rejects this literal reading of *Conley* and required that pleadings state sufficient facts to show not just a possible, but a "plausible" claim of relief. Instead of the 'no set of facts' standard of *Conley*, *Twombly* endorsed the standard that a complaint be plausible to the extent that from the facts alleged there is a " 'reasonably founded hope' that a plaintiff would be able to make a case," citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) and its quote from *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975).

## III. ANALYSIS

### A. The ESOP Presumption Of Reasonableness

Defendants assert that the Plans are ESOPs and thus they are entitled to a presumption of reasonableness regarding their continued investment in the Ford Stock Fund. They assert further that Plaintiffs have not alleged sufficient facts in their Complaint to state a claim for breach of their fiduciary duties. Plaintiffs counter that the funds are not ESOPs, but even if they are, that their allegations are more than sufficient to state an ERISA claim under Rule 8(a) and 12(b)(6) standards.

"In drafting the ESOP provisions of ERISA, Congress intended to encourage employees' ownership of their employer company. In order to promote this goal, Congress carved out specific exceptions to certain fiduciary duties in the case of an ESOP." *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995). Thus, while ERISA ordinarily imposes high fiduciary duties of loyalty and prudence and an exclusive purpose requirement, "as a general rule, ESOP fiduciaries cannot be held liable for failing to diversify investments, regardless of whether diversification

11

would be prudent under the terms of an ordinary non-ESOP pension plan." *Id.* Moreover, an ESOP is exempted from ERISA's otherwise strict rules against self-dealing. *Id.* (citing *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992)).

One of the leading cases trying to reconcile the Congressional policy of encouraging company ownership by employees and exempting such funds from the diversification requirement with the general fiduciary standards set out in ERISA is *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995). In *Moench*, the Third Circuit rejected the possibility that a *de novo* standard be applied toward reviewing the decisions of ESOP fiduciaries and adopted an abuse of discretion standard. It established for an ESOP fiduciary a presumption that "it acted consistently with ERISA by virtue of that decision" not to diversify. *Id.* at 571. It noted that this presumption could be rebutted in those narrow circumstances where "'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.' Restatement (Second) § 227 comment g." *Id.* Thus, a plaintiff "must show the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." *Id.*

In adopting the Third Circuit's approach in *Moench*, the Sixth Circuit similarly held,

> a proper balance between the purpose of ERISA and the nature of ESOPs requires . . . review [of] an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion. In this regard, we will presume that a fiduciary's decision to remain invested in employer securities was reasonable. A plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.

*Id.* at 1459. Adopting this standard, the Sixth agreed that a plaintiff asserting a prudence claim must show that the ESOP fiduciaries' decision to invest in company stock was an abuse of

discretion. *Id.* Further, "in attempting to rebut the presumption, the plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." *Id.* (citing *Moench*, 62 F.3d at 571).

Defendants portray Count I of the Complaint as a failure to diversify claim, as opposed to a breach of the duty of prudence under ERISA, and based on this portrayal contend that the Complaint is a "full-scale assault" on "Congressional policies endorsing ESOPs . . . ." (Dkt. #73, p. 25). The Supreme Court has noted that in enacting ERISA, "The crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985). Accordingly, ERISA puts in place strict fiduciary duties for the purpose of protecting plan assets. *Kuper*, 66 F.3d at 1457. These obligations, drawn from the law of trusts, include strict compliance with the duties of prudence and loyalty. The duty of loyalty requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." *Id.* at 1458 (quoting ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)). The duty of prudence imposes "'an unwavering duty' to act both 'as a prudent person would act in a similar situation,' [and] 'with single-minded devotion' to the plan participants and beneficiaries." *Id.* (citation omitted); *accord In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 905 (E.D. Mich. 2004) (holding that ERISA § 404(a)(1) imposes duties of loyalty and prudence on a fiduciary).

As noted above, ERISA exempts ESOP fiduciaries from the statutory duty to diversify. ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2). But this exemption is not an absolute defense to

fiduciary liability, it has an outer boundary. In *Kuper,* the Sixth Circuit emphasized that the diversification exemption is limited:

> Thus, as a general rule, ESOP fiduciaries cannot be held liable for failing to diversify investments. . . . However, the statutory exemptions for ESOPs in ERISA 'do[] not relieve a fiduciary . . . from the general fiduciary responsibility provisions of [29 U.S.C. § 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion . . . nor does it affect the requirement . . . that a plan must be operated for the exclusive benefit of employees and their beneficiaries.

*Kuper*, 66 F.3d at 1458 (original ellipses, citations omitted); *accord Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978) ("the structure of the Act itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of §§ 404(a)(1)(A) and (B)").

Here, consistent with ERISA, Plaintiffs allege that Defendants breached their fiduciary duties under ERISA by continuing to offer the Ford Stock Fund as an investment option and making contributions to the fund when it no longer was a prudent investment for participants' retirement savings. As discussed below, the Complaint sets forth in detail the bases for this allegation by describing the particular facts and circumstances that caused Ford stock to be an unduly risky and inappropriate retirement plan investment. It asserts that Defendants, who had actual or constructive knowledge of Ford's dire financial circumstances, had a duty under ERISA and the Plans to continually evaluate the propriety of investing the Plans' assets in Ford stock and to take action to protect the Plans if that investment was no longer prudent (Compl. ¶¶ 170-79). They argue that the law on which this claim is based is well established, particularly in the Sixth Circuit. *In re Goodyear Tire & Rubber Co. ERISA Litig*.,

438 F .Supp. 2d 783, 793 (N.D. Ohio 2006) (holding dismissal on the pleadings improper when

plaintiffs allege imprudent management of plan investment in company stock); *In re AEP ERISA*

*Litig.*, 327 F. Supp. 2d 812, 831 (S.D. Ohio 2004) (same); *CMS*, 312 F. Supp. 2d at 914 (same);

*Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003) (same).

### B.    The Plans are ESOPs

As a threshold matter, Plaintiffs argue that whether the Plans are truly ESOPs can and

should only be determined after fact discovery, not at the pleading stage (Dkt. #76, p. 10).  In

considering a defendant's motion to dismiss, it is proper for the Court to take into account any

relevant plan documents.  *In re Cardinal Health, Inc. Erisa Litig.*, 424 F.Supp.2d 1002, 1015

(S.D. Ohio 2006).  Courts may consider ERISA plan documents not attached to a complaint

where a plaintiff's claims are "based on rights under the plans which are controlled by the plans'

provisions as described in the plan documents" and where the documents "are incorporated

through reference to the plaintiff's rights under the plans, and they are central to plaintiff's

claims."  *Id.* (citing *Weiner v. Kais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).  Thus, "materials

central to the claims asserted, including exhibits to the defendant's moving papers, may be

considered when ruling on a motion to dismiss without converting it to a summary judgment

motion."  *Weiner*, 108 F.3d at 89.[5]

In support of its motion to dismiss, Defendants provide the texts of the Salaried and the

Hourly Plans.  These documents are therefore appropriately before the Court because Plaintiffs

---

[5] But *see Shirk v. Fifth Third Bancorp*, No. 05-49, 2007 WL 1100429 (S.D. Ohio Apr. 10, 2007)("Where the plaintiffs are alleging a breach of fiduciary duty based not only on failure to diversify but also because a company's stock was itself an imprudent investment, 'it is neither necessary nor appropriate' for the Court to determine whether a plan qualifies as an ESOP on a motion to dismiss."(citation omitted)).

refer to and quote from them at length. *Id.* ("'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'") (quoting *Venture Assoc. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993)). Plaintiffs also attach to their Complaint a number of the Plan Documents for both the Salaried and Hourly Plans (*See,* Dkt. #71, Ex. A-C; Ex. G-K). In the present case, whether the Plans are ESOPs is not, as Plaintiffs contend, a factual question requiring expert testimony. Rather, on the Plans' Documents, it is possible for this Court to make a determination as a matter of law regarding the status of the Plans at issue. *See*, *In re General Motors ERISA Litig*., No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006) (Edmunds, J.) (Holding that whether a Plan is an ESOP "is purely a legal question requiring application of the relevant law to the text of the Plans, a task well within the province of this Court.").

ERISA defines an ESOP as an individual account plan "which is designed to invest primarily in qualifying employer securities . . . ." ERISA § 407(d)(6)(A); 29 U.S.C. § 1107(d)(6)(A). ESOPs must be qualified under the Internal Revenue Code and any other requirements that the Secretary of the Treasury deems appropriate. *Id.* Moreover, an ESOP "must be formally designated as such" and must "specifically state[] that it is designed to invest primarily in employer securities." 26 C.F.R. § 54.4975-11(a)(2), (b).

Based on a review of the Plans and the parties' arguments, it appears that, as a matter of law, the Plans at issue are indeed ESOPs. Both Plans specifically claim to be an ESOP (*see, e.g.*, SSIP Plan Document, as amended effective through September 1, 2001, attached to Compl. as Ex. H, Article XV, § 15.1, Ford-ER00816 ("2001 SSIP Plan Document") ("The Employee Stock Ownership Plan ("ESOP") established in the Plan effective January 1, 1989, shall consist of all

the shares of Company Stock in the Plan at any time. . ."); 2004 SSIP Plan Document, Article XV, § 15.1, Ford-ER00749; *see also* TESPHE Plan Document, as effective on Oct. 9, 1999, attached to Compl. as Ex. I, Article XXVII, § 1, Ford-ER00489 ("1999 TESPHE Plan Document") ("There was established in the Plan an Employee Stock Ownership Plan ("ESOP") effective January 1, 1989); 2003 TESPHE, Article XXVII, § 1, Ford-ER00047). Both the Hourly and Salaried Plan documents require the Plans to offer the Ford Stock Fund as an investment option (*see, e.g.*, 2001 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00793; 2004 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00722; *see also*, 1999 TESPHE, Article XIII, § 1(a), Ford-ER00476; 2003 TESPHE, Article XIII, § 1(a), Ford-ER00029). All of the Plans fulfill the legal requirement of an ESOP to invest primarily in Company stock. *Id.* In 2006, both Plans required investments exclusively in Company stock (*See* 2006 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00130; April 13, 2006, Amendments, Ford-ER00067-69).[6]

The Plans are also eligible individual account plans ("EIAPs"), defined in ERISA as "individual account plan[s] which [are] (I) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on the date of enactment of this Act and which on such date invested primarily in qualifying employer securities." ERISA § 407(d)(3)(A); 29 U.S.C. § 1107(d)(3)(A). Here, all the Plans are

---

[6] Prior to 2006, the language referring to the Ford Stock Fund and the Plans' status as ESOPs were contained in separate sections of each Plans' Documents. In 2006, both Plans merged the language in these separate sections and state: "It is the Company's intent that to the fullest extent permitted by ERISA, that the Ford Stock Fund be a permanent feature of the Plan and that it shall qualify as an employee stock ownership plan under Section 407(d)(6) of ERISA . . ." (*See* 2006 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00130; April 13, 2006, Amendments, Ford-ER00067-69).

17

employee savings plans with the option to invest in the Ford Stock Fund, which required

investment primarily (and after April 13, 2006, exclusively) in Ford stock. All EIAPs, including

but not limited to those that are also ESOPs, are subject to the exemption from ERISA's

diversification requirements. *See* ERISA § 404(a)(2); 29 U.S.C. § 1104(a)(2) ("In the case of an

eligible individual account plan . . . the diversification requirements of paragraph [404(A)](1)(C)

and the prudence requirement (only to the extent it requires diversification) of [404(A)](1)(B) is

not violated by acquisition or holding of . . . qualifying employer securities[.]"). *See also*, *Edgar*

*v. Avaya, Inc.,*503 F.3d. 340, 347 (3rd Cir. 2007) ("EIAPs, like ESOPs, 'place employee

retirement assets at much greater risk' than traditional ERISA Plans. Given these similarities,

we conclude that the underlying rationale of *Moench* applies equally here."). The Sixth Circuit

has endorsed the application of the presumption of prudence to EIAPs. *See Landgraff v.*

*Columbia/HCA Healthcare Corp*., No 3-98-0090, 2000 WL 33726564, at *6 (M.D. Tenn. May

24, 2000) (applying *Kuper* presumption of prudence to EIAP), *aff'd mem.*, No. 00-5834, 30 Fed.

Appx. 366 (6th Cir. 2002)[7]; *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097

(9th Cir. 2004) (applying presumption of prudence to EIAPs).

Plaintiffs contend that the Ford Stock Fund is not an ESOP or subject to the presumption

of prudence because it is a component of the Plans that "offer but not do not require investment

in Ford stock (Dkt. #76, p. 12)("the presumption [of prudence] does not apply to 401(k) plans

that offered, among other investment options, a company stock fund"). This is significant,

---

[7] The *Landgraff* case in the preceding paragraph used the term "presumption of reasonableness" in referring to an ESOP. The terms seem to be interchangeable, with *Kuper* using "presumption of reasonableness," *Kuper*, 66 F.3d at 1458, and the Third Circuit referring to "*Moench's* presumption of prudence." *Edgar*, 503 F.3d. at 347.

according to Plaintiffs, because they read a temporal ownership requirement into the ERISA ESOP definition. *Id.* at 11 ("Thus the Plans **are not** designed to **maintain** employee ownership as contemplated by Congress . . . [because they] allow[] a participant to make five sales or purchases monthly . . . a policy that still was inconsistent with encouraging or maintaining employee ownership over the long-term.")(emphasis in original). Yet, governing Internal Revenue Service regulations make clear that "[a]n ESOP may form a portion of a plan the balance of which includes a qualified pension, profit sharing or stock bonus plan which is not an ESOP." Treas. Reg. § 54.4975-11(a)(5); *see also* Joint Committee on Taxation's General Explanation of Tax Legislation Enacted in the 109th Congress, 552 ("An ESOP can be an entire plan or it can be a component of a larger defined contribution plan.").

Plaintiffs cite no authority for the supposed limitation that participants must be locked into their investment in employer stock and forced to "maintain" that investment, in order for the plan to constitute either an ESOP or an EIAP. Moreover, the frequency of participant transactions into and out of the Ford Stock Fund does not change the fact that whatever assets are in the Ford Stock Fund must have been primarily (and after April 2006 "exclusively") invested in Ford stock (*See, e.g.*, 2006 SSIP Plan Document, Article VIII, § 8.1(a), Ford-ER00130 ("the Ford Stock Fund should be, and should continue to be invested exclusively in Company Stock"); 2003 TESPHE, Article XIII, § 1(a), Ford- ER00029 ("Investments shall be made primarily in shares of Company Stock . . .")). Accordingly, it is proper to treat the Plans at issue as ESOPs.

**C.      The ESOP Presumption of Reasonableness May Apply to a Motion to Dismiss Pursuant to Rule 12(b)(6)**

Based on *Kuper*, Ford argues that Plaintiffs must allege facts sufficient to overcome the "presumption of reasonableness." Unlike the present case, however, *Kuper* went to trial in the district court, and therefore presented a fully developed record upon which to apply the presumption. *Kuper*, 66 F.3d at 1459. The Sixth Circuit has not ruled on how *Kuper* applies to a motion to dismiss.

Plaintiffs cite a number of cases, including two from this district, supporting their argument that the presumption of reasonableness is an evidentiary issue which is inconsistent with the simple notice pleading requirement of Federal Rule of Civil Procedure 8(a), and therefore is not appropriate for consideration on a motion to dismiss. For example, in *In re CMS Energy ERISA Litigation*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) ("CMS ERISA"), the court "note[d] its agreement that [the ESOP presumption of reasonableness] can be overcome by a showing that a prudent fiduciary would have made a different investment decision, and that *this argument cannot carry a motion to dismiss* made under Fed. R. Civ. P. 12(b)(6)." *Id.* at 914 n.10 (internal citation omitted) (emphasis added). And in *Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003), a case arising out of the Kmart bankruptcy, the court read *Kuper* as standing for two important propositions:

> First, the fact that the Plan requires investment in Kmart stock will not *ipso facto* relieve the [defendants] of their fiduciary obligations to prudently invest or to diversify. Second, whether or not they have breached their fiduciary duties requires development of the facts of the case. The result of these two points is that [the plaintiff] has stated a claim against them; whether or not she will prevail is another matter to be determined later.

*Id.* at 879. *See also In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 828 (S.D. Ohio 2004)

("it is neither necessary nor appropriate for the Court, at this juncture, to make a determination of whether the Plan or the Fund qualifies as an ESOP."); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 670 (E.D. Tex. 2004) ("EDS ERISA") ("requiring Plaintiffs to affirmatively plead facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement").[8]

Ford, however, cites several cases in which other courts have granted motions to dismiss based on the presumption of reasonableness. In *Wright v. Oregon Metallurgical* Corp., 360 F.3d 1090 (9th Cir. 2004), the Ninth Circuit held that the district court's dismissal of the plaintiffs' claim with prejudice was appropriate because the "alleged facts effectively preclude[d] a claim . . . , eliminating the need for further discovery." *Id*. at 1098-99. The court noted that the materials attached to the complaint demonstrated that the company at issue "was far from the sort of deteriorating financial circumstances" of companies subject to similar actions, "and was, in fact, profitable and paying substantial dividends throughout [the class] period." *Id*. at 1099

---

[8] In *EDS ERISA*, the district court rested its holding on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), a case in which the U.S. Supreme Court held that in a Title VII discrimination case, a plaintiff need not plead facts sufficient to establish a *prima facie* case under the *McDonnell Douglas* evidentiary framework. The Supreme Court had reasoned in part that the *McDonnell Douglas* framework does not apply to all Title VII cases, but only where a plaintiff can present no direct evidence of discrimination. *Id*. at 511-12. Thus, at the pleading stage, a plaintiff still has two possible theories. The district court in *EDS ERISA* applied this reasoning to the ESOP presumption of reasonableness context, finding that it would be similarly inappropriate to determine at the pleading stage which of two alternate theories--the Plan is an ESOP, or it is not--the facts would ultimately support. *EDS ERISA*, 305 F. Supp. 2d at 670. Necessary to the court's holding, however, was its initial decision not to resolve whether the plans at issue were ESOPs. *Id*. This Court does not disagree with the reasoning of *EDS ERISA*, and if Plaintiffs had given the Court any reason to doubt that the Plans are indeed ESOPs, the Court would be inclined to follow that case. But given that this Court has already held that the Plans are ESOPs as a matter of law, and that Plaintiffs therefore have no alternative but to overcome the presumption of reasonableness, *Swierkiewicz* does not further Plaintiffs' argument.

(comparing facts of *Moench*, 62 F.3d at 572).  Similarly, in *In re Duke Energy ERISA Litigation*, 281 F. Supp. 2d 786 (W.D.N.C. 2003), the court followed the Ninth Circuit's decision in *Wright* by finding that the plaintiffs had failed  to "allege that Duke Energy was anything other than a viable, strong company with substantial assets.  In fact, . . . Duke Energy is a solid, viable company, far from 'impending collapse,' and not in 'dire circumstances.'" *Id.* at 795.  And in *In re Calpine Corp. ERISA Litigation*, 2005 U.S. Dist. LEXIS 9719 (N.D. Cal. Mar. 31, 2005) ("Calpine ERISA"), the court held that based on the facts before it, the plaintiffs "have not and cannot allege facts that could rebut the presumption of prudence." *Id.* at *17.  The Third Circuit, whose *Moench* decision articulating this presumption which the *Kuper* decision adopted, has applied the presumption of prudence in reviewing a Rule 12(b)(6) dismissal.  *See, Edgar v. Avaya, Inc.*,503 F.3d. 340 (3rd Cir. 2007).  It noted that a complaint alleging a stock drop from $10.69 to $8.01 after the company announced it would not meet its previously announced earnings goals without more extreme plus factors as involved in *Moench* was subject to dismissal on the pleadings.

Upon close inspection, most of the cases cited by Plaintiffs and by Ford can be reconciled.  The importance of the cases cited by Ford is not that the plaintiffs did not allege facts sufficient to overcome the presumption of reasonableness, but that the plaintiffs alleged facts that clearly would not qualify.  In effect, they pled themselves out of court, because the facts asserted in their complaints and the supporting documentation precluded relief by being clearly insufficient to require the defendant fiduciaries to disregard the terms of the respective ESOP plans or face being found to have abused their discretion.  In considering what facts are sufficient to meet this standard, each case finding for the defendants was cognizant of the

presumption of prudence that surrounded those defendants.  Accordingly, if Plaintiffs allege

facts that clearly preclude their ability to overcome the presumption of prudence, the Court will

dismiss the Complaint.   But in closer cases where the allegations suggest that with future

discovery there is a " 'reasonably founded hope' that a plaintiff would be able to make a case,"

Courts should not, in effect, apply Rule 56 standards to the complaint on a motion to dismiss.

Thus, while the presumption of prudence is a factor in a motion to dismiss, Plaintiffs do not have

an affirmative burden to plead the specific facts necessary to overcome the presumption.  Yet,

consistent with Rule 8(a)'s notice pleading requirement, they nonetheless have the duty to plead

sufficient facts to demonstrate that they have a plausible ERISA claim in light of the

presumption of prudence, and a "reasonably founded hope" that after discovery they will be able

to rebut that presumption.

     In sum, Defendants are entitled to a presumption of reasonableness in this case.

At this early stage of litigation, however, Plaintiffs' burden is only to put Defendants on

notice of a viable claim for relief, and they need not allege every specific fact that must be

proven in furtherance of their claim.  Count I shall be dismissed if, in light of the presumption

of reasonableness, Plaintiffs' alleged facts preclude relief.

### 1.    <u>Plaintiffs are not required to plead "impending" or "imminent collapse."</u>

     Defendants suggest that the *Kuper* presumption can only be overcome by pleading that

they knew that Ford was facing "imminent collapse." (Dkt. #73, p. 20).  As noted above,

Defendants sought to write this standard into the Plans in 2006.  Yet, several Sixth Circuit

district courts have made clear that an ERISA fiduciary's duty to divest a plan of company stock

is not limited to circumstances where a company is facing imminent or impending collapse:

The "impending collapse" language originates from the *Moench* decision itself. In *Moench*, the Third Circuit recognized that a fiduciary's knowledge of impending collapse, coupled with his conflicted status, can constitute an abuse of discretion. 62 F.3d at 571-72. However, *Moench* involved a company that was, in fact, on the brink of financial collapse. *Id*. at 557. Nowhere in the opinion does the Third Circuit limit its holding to companies facing such dire circumstances. More importantly, the Sixth Circuit opinion adopting the *Moench* presumption, has a much broader holding: "[a] plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper*, 66 F.3d at 1459. **Nowhere in the opinion does the Sixth Circuit use the words "impending collapse."**

*In re Ferro Corp. ERISA Litig*., 422 F. Supp. 2d 850, 860-61 (N.D. Ohio 2006) (emphasis added).[9]

As in the multitude of cases cited above, Defendants' impending collapse argument must be rejected here. The standard simply makes no sense in a case like this and its application would result in needless and avoidable waste of participants' retirement savings. ERISA's duties of prudence and loyalty are the "highest known to the law." *CMS*, 312 F. Supp. 2d at 905 (internal quotes & citations omitted). Lowering the prudence bar to the point that a fiduciary is required to sell company stock only after it has become worthless is impossible to square with ERISA's stated mission of "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and . . . providing for appropriate remedies,

_____

[9] *Accord*, *e.g*., *Goodyear*, 438 F. Supp. 2d at 794 (holding that "*Kuper* has a much broader holding and never uses the words 'impending collapse'"); *In re Cardinal Health, Inc. ERISA Litig*., 424 F. Supp. 2d 1002, 1032-33 (S.D. Ohio 2006) (holding that an ERISA fiduciary could be found imprudent where company stock "was – itself – an imprudent investment" or plan fiduciaries "knew, or had reason to know, that [the company] faced troubles that were certain to cause a decline in the value of its stock"); *In re Sprint Corp. ERISA Litig*., 388 F. Supp. 2d 1207, 1224-25 (D. Kan. 2004) (same and noting as well that impending collapse in *Moench* refers to the collapse of the stock price not the company itself); *In re Honeywell Int'l ERISA Litig*., No. 03-1214, 2004 WL 3245931, at *11 (D.N.J. Sept. 14, 2004) (same); *In re ADC Telecomms., Inc*., No. 03-2989, 2004 WL 1683144, at *6 (D. Minn. July 26, 2004) (same); *In re Mut. Funds Inv. Litig*., 403 F. Supp. 2d 434, 449 (D. Md. 2005) (same).

sanctions, and ready access to the Federal courts." ERISA § 2(b), 29 U.S.C. § 1001(b). Such a standard is akin to requiring monitoring of a patient only after he is dead. *See, Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 411 (7th Cir. 2006), *cert. denied* 127 S. Ct. 1249 (2007) ("selling when bankruptcy is declared will almost certainly be too late").

### 2. <u>Plaintiffs are not required to plead fraud.</u>

Defendants argue that this case must be dismissed at the pleading stage because the Complaint does not allege "fraud or similar corporate malfeasance." (Dkt. #73, p. 22). There are several problems with this argument. First, the Complaint alleges abundant corporate malfeasance and mismanagement, including among other things that (1) in November 2006 Ford restated five years of financial statements (substantially all of its financial reporting during the Class Period)[10] and remains under investigation by the Securities and Exchange Commission (Compl. ¶ 127); (2) Ford effectuated the improper and erroneous Visteon spin-off (Compl. ¶¶ 130-38; (3) Ford has vastly under-funded its pension plans and health care liability (Compl. ¶¶ 139-46); (4) Ford exaggerated its cash position by five to ten billion dollars (Compl. ¶ 158) and; (5) Ford has been in the aggregate seriously mismanaged to the point that the company is in dire financial circumstances (Compl. ¶¶ 148-69).

Second, *Kuper*, the controlling case on this question, does not hold that Plaintiffs must allege fraud.[11] The Sixth Circuit, affirming summary judgment for defendants, held that the

---

[10] Defendants suggest that these claims have little or no effect on the market. Again, these are factors and arguments best reserved to a later stage of this litigation.

[11] *Accord Goodyear*, 438 F. Supp. 2d at 791 ("Even if the fact-finding shows that there was no intentional 'accounting gimmickry and serious mismanagement,' Defendants can still be found to have violated their ERISA-imposed fiduciary duties if they continued to invest in Goodyear stock and they had knowledge (or should have had knowledge) that the stock itself

fiduciaries' presumption of prudence was not overcome by allegations that they failed to

consider diversifying or liquidating company stock in an ESOP, because plaintiffs, alleging

merely that defendants were unreasonable because they were "aware of events that would

continue to cause [company stock] to decline in value," failed to "show a causal link between the

failure to investigate the events and the harm suffered by the plan." *Kuper*, 66 F.3d at 1459,

1460. The alleged events were a recapitalization that adversely affected the company's leverage,

"decreased operational diversity, a major fire at [a] plant . . . and a decline in [the company's] net

sales and income." *Id*. at 1451. The lesson of *Kuper* is that Plaintiffs must allege and eventually

present evidence that a prudent fiduciary would have made a different investment decision. *Id*.

at 1459.

No doubt adducing evidence of fraud or corporate non-disclosure or misrepresentation is

one way to satisfy the rebuttal standard of *Kuper*.[12] Showing an "impending collapse" of the

was not a good investment despite the actual cause of the decline in its value."); *AEP*, 327 F. Supp. 2d at 821-22 (noting that "gravamen" of complaint is "grounded in ERISA," not fraud (quoting *Rankin*)); *Rankin*, 278 F. Supp. 2d at 866 (same). It is notable as to these cases that contemporaneous securities fraud cases were dismissed. Other cases have held that beneficiaries stated an ERISA company stock claim, even though no securities fraud action was concurrently alleged. *Sherrill v. Fed.-Mogul Corp. Ret. Programs Comm.*, 413 F. Supp. 2d 842 (E.D. Mich. 2006); *In re RCN Litig.*, No. 04-5068, 2006 WL 753149 (D.N.J. Mar. 21, 2006). These holdings demonstrate that ERISA cases are not inherently fraud cases and do not depend on fraud allegations; rather, they concern the fiduciary duties under ERISA to prudently manage plan investment, conduct necessary and appropriate investigation into the merits of the investment at issue, and take action when prudence so dictates.

[12] *See In re ADC Telecomms., Inc.*, No. 03-2989, 2004 WL 1683144 (D. Minn. July 26, 2004), at *6 (D. Miss. July 26, 2004) ("[W]here fraudulent practices are alleged there is no need to plead impending collapse of the corporation . . . . Plaintiffs' inability to show ADC filed bankruptcy or was on the verge of imploding does not preclude the present suit."); *Honeywell*, 2004 WL 3245931, at *11 (allegations that defendant fiduciaries were privy to fraud that inflated stock prices were sufficient to overcome the presumption although the company remained financially viable); *In re Sears Roebuck & Co. ERISA Litig.*, No. 02-8324, 2004 WL 407007, at

company's stock is another.  *Moench*, 62 F.3d at 572 (reversing summary judgment for defendants, noting that further development of the factual record could support rebuttal of the presumption of reasonableness where the plaintiff beneficiaries alleged a  "precipitous decline" of company stock, conflict of interest among the fiduciaries and the fiduciaries' knowledge of "impending collapse" of the stock).  But nothing in *Kuper* rules out the possibility of demonstrating imprudence by showing that the stock has become excessively risky as a result of massive mismanagement; overwhelming debt and liabilities; conflicted, self-serving and disloyal fiduciaries; and the very real possibility that a company's fortunes are so diminished that it is at risk of collapse.  As Judge Posner held, such circumstances state a claim under ERISA.  *Cf. Summers*, 453 F.3d at 410-11 ("'even if the trustees did not predict the company's "impending collapse" they might be required in the interest of the participants either to diversify the plan's stockholdings or to exchange the . . . stock for Treasury bills.'" (quoting *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003)).[13]   The duty of prudence under ERISA, whether applied to company stock, or any other investment, is stated to be an objective standard.  The inquiry is

---

*4-5 (N.D. Ill. Mar. 3, 2004) (same).

[13] *See also Sears*, 2004 WL 40700, at *7 (noting that, while accounting regularities made up part of plaintiffs' breach of fiduciary duty claims, "Plaintiffs also allege that publicly known macroeconomic facts were available to Defendants before the start of the class period. According to Plaintiffs, these factors, including increased competition and the general downturn of the economy, indicated there was no reason for the Plan to invest so heavily in Sears stock. Whether these macroeconomic factors existed and their effect on Sears stock are **questions of fact**.") (emphasis added); *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1368-69 (N.D. Ga. 2004) (upholding imprudence claims which rested to a large degree on non-fraud allegations that BellSouth was not fully forthcoming about the true risk of its unusually large corporate "bet" on its Latin American operations.).

what a prudent person would do under similar circumstances.[14] *Kuper*, 66 F.3d at 1458.

Plaintiffs are entitled to present evidence in this case that a reasonable fiduciary would not have

acted similarly to the manner in which the Ford fiduciaries acted, regardless of their not making

---

[14] The line, unfortunately, is not a bright one. Reduced to its core, the *Moench/Kuper* presumption of prudence provides fiduciaries a "safe harbor"until continuing to invest in company stock is "imprudent." While the presumption may provide a "thumb on the scale" for a period of time in making that determination, at what point along a stock's decline is the thumb to be removed. *Moench* asks the central question of "How is an ESOP fiduciary to determine when diversification is in the best interest of the beneficiaries?" *Moench,* 62 F.3d. at 570. Should "nontangible loyalty interests served by retaining ESOP investments in employer stock" be a factor? Can the fiduciary acknowledge that ESOPs were not designed to guarantee retirement income? These are not safe retirement funds for most average income workers. Judge Richard Posner in *Summers v. State Street Bank,* 453 F.3d 404, 410-411 (7th Cir. 2006), makes the economically sound observation, that the prudence in continuing to hold company stock depends on how diversified the other holdings of the investor are, and that ESOPs are extremely risky for most retirement accounts. This is particularly true for employees who, upon the company failure, would lose their retirement wealth as well as their current income. Yet, such considerations regarding other holdings are apparently not permitted in ESOP cases. It seems the fiduciary cannot look to the other 401(k) investments available to the employees (here they were substantial) but only to the single ESOP fund (If such factors were allowed, class action treatment would not be appropriate because individual factors would swamp common ones.). Judge Posner also questions the capacity of courts to determine the right point or points when ESOP fiduciaries should start to diversify. *Id*. at 411.

*Kuper* acknowledges that this is a "difficult area." *Kuper,* 62 F.3d. at 571. In adopting the abuse of discretion standard, *Kuper* quotes *Moench*'s concern about the risks of turning the standard of review for ESOPs into that of ordinary pension plans. *Id.* at 1458. *Moench* also notes the dilemma facing an ESOP fiduciary who diversified and then the company stock recovers – he also faces liability. *Moench,* 62 F.3d at 571-72. *Kuper* refers to the presumption of reasonableness being rebutted when "a prudent fiduciary acting under similar circumstances would have made a different decision." That cannot mean finding a single prudent fiduciary in circumstances where reasonable fiduciaries could differ, because that would reduce this to a *de novo* standard of ERISA review for ESOPs. If there is a "zone of choice" where reasonable fiduciaries would disagree, the abuse of discretion standard must protect a fiduciary's choice not to diversity. The *Moench* standard to rebut the presumption is that "plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's directions was in keeping with the settlor's expectations of how a prudent trustee would operate." This suggests that the standard necessary to rebut the presumption of prudence is that no reasonable fiduciary in similar circumstances would have continued investing in company stock. Only then does it seem that ESOP fiduciaries can fulfill their duties in the safe harbor that Congress seems to have intended to provide them.

allegations of fraud or the impending threat of bankruptcy.

Finally, Defendants overstate the cases that they rely on for the proposition that fraud must be alleged. The district court in *Stein v. Smith*, 270 F. Supp. 2d 157, 166 (D. Mass. 2003), did not hold that pleading fraud is required and noted specifically that "the many pages of factual recitations relating to financial chicanery lend no necessary weight to a claim for breach of fiduciary duty." While holding that an allegation that Textron "artificially inflated its stock price" was sufficient to defeat a motion to dismiss, the First Circuit in *Lalonde v. Textron, Inc.*, 369 F.3d 1 (1st Cir. 2004), was careful to note that it was not creating a "hard-and-fast rule":

> Because the important and complex area of law implicated by plaintiffs' claims is neither mature nor uniform, . . . **We believe that we would run a very high risk of error were we to lay down a hard-and-fast rule** (or to endorse the district court's rule) based only on the statute's text and history, the sparse pleadings, and the few and discordant judicial decisions discussing the issue we face. Under the circumstances, further record development – and particularly input from those with expertise in the arcane area of the law where ERISA's ESOP provisions intersect with its fiduciary duty requirements – seems to us essential to a reasoned elaboration of that which constitutes a breach of fiduciary duty in this context.

*Id.* at 6-7 (emphasis added).

*Ward*, *Wright* and *Edgar* were simply factually thin cases. In *Ward v. Avaya, Inc.*, 487 F. Supp. 2d 467, 479-80 (D.N.J. 2007), the court dismissed the complaint because the plaintiffs only alleged operational losses, employee layoffs and a fall in stock price. In *Wright*, as noted above, "[the company] was, in fact, profitable and paying substantial dividends throughout that period." *Wright*, 360 F.3d at 1099.

Defendants' most aggressive posture is holding forth *DiFelice v. US Airways, Inc.*, 436 F. Supp. 2d 756, 786 (E.D. Va. 2006) ("*DiFelice II*"), as requiring pleading fraud here. They overlook the procedural subtlety that *DiFelice II* was a judgment following trial, and that

summary judgment was denied in *DiFelice I* notwithstanding that the complaint did not allege "fraud or concealment by a fiduciary or that the fiduciary possessed crucial information not publicly available." *DiFelice I*, 397 F. Supp. 2d at 773. The court in *DiFelice I* held that plaintiffs' allegations, which largely concerned the alleged dire financial circumstances faced by US Airways, were "sufficient to allow a jury to question the prudence of the decision to continue to allow the Plan to invest in US Air Group stock." *Id*. at 774. Accordingly, on summary judgment, the court declined to resolve the thorny factual dispute over whether US Airways fulfilled its fiduciary duty to act prudently in selecting and managing its company stock fund as an ERISA plan investment. *Id*. at 775. Resolution of this same issue at the pleading stage without any evidentiary record, as Defendants urge here, would be inappropriate.

Wisconsin Professors John Kaminski and Richard Leffler in a Federal Judicial Center presentation to judges in the Eastern District of Michigan recounted a history professor asking his class "what was the cause of the American Revolution?" The young cleric called upon paused a moment and then responded "one damned thing after another." Professors Kaminski and Leffler thereafter demonstrated in their presentation the accuracy of that response. While the territory of potential liability for ESOP fiduciaries is still largely uncharted, short of pleading fraud or imminent collapse of a company, it must be acknowledged that when the facts are sufficient, the presumption of prudence can be rebutted by a showing a constellation of "one damned thing after another." Plaintiffs are seeking to present such a case.

### D. Plaintiffs' Alleged Facts Are Sufficient To Justify Denying Defendants' Motion To Dismiss

Plaintiffs' primary allegation, which recurs throughout the Complaint in various contexts, is that Defendants ignored serious red flags that should have alerted them to the

fact that Ford stock was not a prudent investment for the Plans. To be sure, this language suggests a theory based on general ERISA-imposed fiduciary duties, rather than the duties specific to ESOPs. But this alone does not necessarily preclude recovery. The Court must determine whether the facts alleged in the Complaint and in the referenced documents are inconsistent with a finding in Plaintiffs' favor.

An analysis of the facts that Plaintiffs will eventually need to prove begins with *Kuper*, in which the defendant's stock declined from more than $50 per share to about $10 per share in an eighteen-month period. The court noted that the "plaintiffs merely assert[ed] that defendants' decision to continue to hold [company] stock was unreasonable because defendants were aware of events that would continue to cause [a] decline in value." *Kuper*, 66 F.3d at 1460. The court found that because "a prudent fiduciary acting under similar circumstances" would not necessarily have acted differently, this conduct alone was insufficient to overcome the presumption of reasonableness. *Id.* at 1459.

In *Wright*, the Ninth Circuit echoed this reasoning, stating that "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the [ESOP] presumption." *Wright*, 360 F.3d at 1099. In a footnote, the court distinguished cases reaching the opposite result, including one from this district:

> Plaintiffs point to two decisions that are allegedly counter to this analysis, *Stein v. Smith*, 270 F. Supp. 2d 157 (D. Mass. 2003), and *Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003). Although in both cases the courts . . . denied 12(b)(6) motions to dismiss, each case is readily distinguishable. In *Smith*, the complaint specifically alleged that the company's "financial collapse," including "an accumulation of large, undisclosed losses on major projects as well as an impending liquidity crisis that was not adequately disclosed to the public," played a pivotal role in the administrators' breach of their fiduciary duties. 270 F. Supp. 2d at 164. Moreover, the complaint alleged that "defendant Smith was integrally involved in making decisions about bidding and disclosure of S & W's finances, and that the other defendants either were

aware or should have been aware of the mounting problems." *Id*. Unlike the present case . . . , in which the only allegations involved downward fluctuations in stock price, the allegations in *Smith* clearly implicated the company's viability as an ongoing concern. Similarly, in *Rankin*, the company at issue (Kmart), went bankrupt. The complaint specifically alleged that the plan administrators "failed to give Plan participants accurate, complete, non-misleading and adequate information about the compositions of the Plans' portfolios and accurate information about Kmart and its true financial condition." *Rankin*, 278 F. Supp. 2d at 863.

*Wright*, 360 F.3d at 1099, n.5.

Another case adds to this analysis. In *Lalonde v. Textron, Inc*., 270 F. Supp. 2d 272 (D.R.I. 2003), a federal district court held, in an often-cited opinion, that the presumption of reasonableness "may be overcome when a precipitous decline in the employer's stock is combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." *Id.* at 280. Applying this standard, the district court found that the plaintiffs had failed to overcome the presumption, because "at no time was Textron stock unsuitable for investment." *Id.*

When *Textron* reached the First Circuit, it was vacated in part. *Lalonde v. Textron, Inc*., 369 F.3d 1, 7-8 (1st Cir. 2004). The appellate court did not disagree with the district court's articulation of the applicable standard, but took issue with the finding that the plaintiffs had failed to meet their burden under Rule 12(b)(6):

> [T]he district court's analysis, while perhaps convincing on its own terms, failed to take account of plaintiffs' allegation that, during the period identified in the complaint, Textron artificially inflated its stock price by concealing "the disparate problems throughout Textron's segments and their adverse effect on Textron which are the subject of a federal securities lawsuit by shareholders against Textron and certain of its officers and directors." While this allegation is not terribly specific, Textron surely is aware of the nature of the charges it faces in the separate lawsuit. The allegation is thus sufficient to play its part in effectuating the purposes of Fed. R. Civ. P. 8(a): to give Textron "fair notice of what [the plaintiffs'] claim is and the grounds upon which it rests." And, when combined with the other allegations, it is sufficient to clear the Rule 12(b)(6) hurdle . . . . The odds of plaintiffs succeeding on

their breach of fiduciary duty claims against the Textron defendants might be very long, but "that is not the test."

*Id.* at 6-7 (internal citations omitted).

These authorities provide a map for the evidence that Plaintiffs will eventually need to produce in furtherance of their claim. It will not be enough for Plaintiffs to prove that Ford stock was an unwise investment or that Defendants ignored a decline in stock price. Rather, to overcome the presumption of reasonableness, Plaintiffs must show that the circumstances would have prompted a reasonable fiduciary in the same ESOP circumstances to make different investment decisions. Specifically, Plaintiffs must prove that Defendants were aware of facts showing that Ford's "viability as an ongoing concern" was in jeopardy. Or, as articulated in the district court opinion in *Textron*, Plaintiffs must show "a precipitous decline in the employer's stock . . . combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." *Textron*, 270 F. Supp. 2d at 280.

Here, Plaintiffs plead substantial bases for establishing that Ford stock became an imprudent investment option for participants' retirement savings during the Class Period. In particular, the Complaint alleges (1) a precipitous stock price decline from over $30 to under $7 during the Class Period;[15] (2) serious, if not gross, mismanagement evidenced by, among other things, (a) management's failure to control Ford's liabilities and other obligations in respect of current and future retirees; (b) management's failure to design and manufacture products that are

---

[15] Moreover, at the March 4, 2008, hearing. Plaintiffs presented a PowerPoint presentation showing that on December 30, 1999, the amount of Ford stock in the Plans totaled 196 million shares and was worth $10.5 billion. By December 31, 2006, the amount of Ford stock in the Plans had grown by 57% to 308 million shares, but had decreased in value by 78% to $2.3 billion.

competitive in the marketplace; and (c) management's incurring of at least $1.1 billion in extra, unanticipated charges as a result of its determination to reassume the payroll, retirement and other liabilities of Visteon, five years after it spun the operation off, ostensibly to avoid those liabilities; and (3) Ford's being on the brink of collapse, as evidenced by (a) the steady, inexorable decline in Ford's credit ratings; (b) the steady, inexorable decline in Ford's Altman Z-Score; (c) the steady climb of Ford's debt-equity ratio and the escalation to undue levels of the risks of continuing to invest in Ford stock; and (d) the mortgaging of every last asset of Ford, including its Blue Oval logo, to convince lenders to give Ford enough cash to continue operations (Compl. ¶ 214). Based on these circumstances, the Complaint alleges that "there is a serious question as to Ford's viability . . . ." *Id.* at ¶ 5. Each of these allegations is supported by detailed factual information set forth in the Complaint. *Id.* at ¶¶ 100-179.

Furthermore, the Complaint alleges that Defendants ignored the abundant financial warning signs; failed to conduct an appropriate investigation into whether Ford stock remained a prudent investment for the Plans, which may have revealed to a reasonable fiduciary that it was not; and failed to provide participants with adequate information regarding Ford's problems so that participants could make informed decisions regarding their investments in Ford stock in the Plans (Compl. ¶¶ 170, 173-74, 241). Plaintiffs also plead bases for the conclusion that Defendants breached their duty of loyalty to the beneficiaries of the Plans by amending the Plans in self-serving ways that provided no benefit to the Plans' beneficiaries (Compl. ¶¶ 191-197).[16]

---

[16] Plaintiffs argue that Defendants' post-hoc appointment of an independent fiduciary does not protect them from liability. They contend that instead of empowering a truly independent fiduciary to see to it that the Ford Stock Fund was prudently and loyally managed free of conflict or bias, Defendants appointed the independent fiduciary, bound it to follow a defective standard that is contrary to ERISA, and attempted to absolve themselves of

At the March 4, 2008, hearing, Plaintiffs further argued their case by providing an extensive PowerPoint presentation to which Defendants responded on March 12, 2008 (Dkt. #84).[17] In that presentation, Plaintiffs further highlighted a number of signs that might have suggested to a reasonable fiduciary at some point during the Class Period that Ford was in serious financial trouble and that its stock was an unsuitable investment for the Plans. Those signs include the following:

1. Ford's credit rating was significantly downgraded during the Class Period from A2 ("upper-medium grade . . . subject to low credit risk") on April 4, 2000 to Caa1 ("of poor standing . . . subject to very high credit risk") on February 29, 2008. Source: Bloomberg L.P.; Moody's Rating Symbols & Definitions, Aug. 2003, at 8.

2. Wall Street Analysts' downgraded Ford stock 44 times during the Class Period through March 3, 2008. Source: Yahoo! Finance, March 3, 2008.

3. Ford experienced a 200% increase in its debt-equity ratio from 3.85x on

_____

responsibility for its actions (Compl. ¶¶ 193-95). Plaintiffs conclude that as with the 2006 amendments to the Plans it is an issue of fact whether Defendants' actions with respect to the independent fiduciary breached their duties of prudence and loyalty under ERISA.

[17] In their response, Defendants argue that the gravamen of the Complaint is that although Ford stock may have been a "suitable investment" for some investors, it was not a prudent investment for "retirement savings plans for ordinary employees" (Compl. ¶ 101). Defendants contend that this premise cannot be squared with the Sixth Circuit's controlling decision in *Kuper,* which Defendants argue "places a thumb on the scale in favor of settlor intent to permit ESOPs to invest in employer stock" (Dkt. #84, p. 2). As discussed below, the notion that Defendants could manage the investments of the Plans imprudently because the settlor wanted them to is contrary to the Defendants' fiduciary duty under ERISA, and in particular their duty to disregard provisions of the Plans that would lead to an imprudent result. In their Complaint, Plaintiffs take care to note that the Ford would only be a "suitable investment" for investors able to withstand the large risk of significant loses (Compl. ¶ 101). Plaintiff indicate that the Plans are retirement savings plans for "ordinary employees" and "unlike typical portfolios for institutional investors or wealthy individuals, the investment options for the Ford Plans consisted only of money market funds, mutual funds and the Ford Stock Fund." *Id.* Accordingly, Plaintiffs conclude that the "highly risky Ford stock could not prudently be part of this array of investment options for several reasons," which they go on to state in detail. *Id.*

December 31, 2000, to 11.41x on December 31, 2007.  Source: Bloomberg L.P.

4.     Ford terminated its dividend payments during the Class Period.  Source: Bloomberg L.P.

5.     Ford experienced a 34% decline in its U.S. market share from 23.7% (car & truck) in 2000 to 15.6% (car & truck) in 2007.   Source: Ford Motor Company, Annual Report (Form 10-K), Dec. 31, 2007; Ford Motor Company, Annual Report (Form 10-K), Dec. 31, 2004.

6.     Ford decreased its workforce by 33% from 364,550 employees on December 31, 1999, to 246,000 employees on December 31, 2007.  Source: Ford Motor Company, Annual Report (Form 10-K), Dec. 31, 2007; Bloomberg L.P.

7.     Ford suffered a 82% decline in shareholders' equity from $28.3 billion on December 31, 1999, to $5.0 billion on December 31, 2007.   Source: Bloomberg L.P.

8.     Ford stock underwent a 93% decline in book value from $22.44 per share on December 31, 1999, to $1.64 per share on December 31, 2007.  Source: Bloomberg L.P.

9.     Ford suffered a 138% decline in its net income from $7.2 billion in 1999 to negative $2.7 billion in 2007.  Source: Bloomberg L.P.

10.    Alan Mulally, Chief Executive Officer & President of Ford Motor Company, summarized the parlous objective financial information about the Company during the Class Period by declaring: "The data say we're going out of business."  Source: Compl. ¶ 155 (citing George F. Will, *Ford Tries to Outrace the Repo Man*, WASH. POST, December 24, 2006, at B7).

Defendants are correct that these are largely not facts asserted in the Complaint, and may only be appropriately considered at a later stage, if at all, unless the Complaint is amended again. Yet, they are data that when coupled with all the facts and allegations contained in Plaintiff's 95 page, 293 paragraph Complaint support a conclusion that Plaintiffs have a "reasonably founded hope" that with further discovery they can make out a case sufficient to rebut the presumption of prudence.  The series of economically troubling data asserted in the Complaint and the assertions

of mismanagement in this case distinguish it from those cases where at the Rule 12(b)(6) stage the plaintiffs pled themselves out of court. The Complaint must be read in the light most favorable to the Plaintiffs and as such, it is a Complaint that cannot be dismissed on Defendants' motion to dismiss. This is not to say that Plaintiffs will prevail in carrying their very heavy burden at later stages of this litigation, but merely that they should be afforded an opportunity to proceed beyond the pleading stage.

Moreover, denial of Defendants' motion is consistent with the actions taken by other courts in the Sixth Circuit that have uniformly denied motions to dismiss in company stock cases. In the Eastern District of Michigan, these cases include:

1. *In re General Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006) (Edmunds, J.), denying a motion to dismiss even when: (1) "throughout the six-year class period General Motors had been a solvent and profitable business enterprise" *Id.* at *11; (2) even when assets increased; (3) even when stockholders' equity increased and; (4) even when General Motors never failed to pay dividend.

2. *Sherrill v. Fed.-Mogul Corp. Ret. Programs Comm.*, 413 F. Supp. 2d 842 (E.D. Mich. 2006) (Cohn, J.), denying a motion to dismiss even when no allegations of fraud. *Id.* at 853-56.

3. *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) (Steeh, J.), denying a motion to dismiss even where breach of fiduciary duty claims do not sound in fraud. *Id.* at 909. And holding that while "certain exemptions exist in the law for ESOPs under ERISA . . . a fiduciary retains the general responsibilities set forth in [29 U.S.C. § 1104]." *Id.* at 914.

4. *Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003) (Cohn, J.), denying a motion to dismiss even where ERISA breach of fiduciary duty claims do not sound in fraud. *Id.* at 865-66.

Outside the Eastern District of Michigan, and throughout the Sixth Circuit, other courts have also reached a similar result. Some of these cases include:

1. *In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F .Supp. 2d 783 (N.D.

Ohio 2006), denying a motion to dismiss and finding that "Plaintiffs need not pled that Goodyear was on the brink of an impending collapse . . . " *Id.* at 794.

2.  *In re Cardinal Health, Inc. ERISA Litig*., 422 F. Supp. 2d 1002 (S.D. Ohio 2006), denying a motion to dismiss and adopting *In re AEP* holding that "requiring Plaintiffs to affirmatively pled facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement." *Id*. at 1033.

3.  *In re Ferro Corp. ERISA Litig*., 422 F. Supp. 2d 850 (N.D. Ohio 2006), denying a motion to dismiss and stating that *Kuper* does not require pleading "impending collapse." "Nowhere in the [*Moench*] opinion does the Third Circuit limit its holding to companies facing such dire circumstances." *Id*. at 860.

4.  *In re AEP ERISA Litig*., 327 F. Supp. 2d 812 (S.D. Ohio 2004), denying a motion to dismiss and finding that "[P]resumptions are evidentiary standards that should not be applied to motions to dismiss." *Id.* at 829.

5.  *Shirk v. Fifth Third Bancorp*., No. 05-49, 2007 WL 1100429 (S.D. Ohio Apr. 10, 2007), denying a motion to dismiss and finding that "[i]t is inappropriate on a motion to dismiss to make a factual finding as to whether the Plan qualifies as an ESOP." *Id*. at *9.

Defendants counter that it was the settlor's intent to maintain the Plans' investment in Ford stock throughout the Class Period (Dkt. #73, p. 14). Accordingly, they argue that Plaintiffs cannot overcome the presumption of prudence that Defendants claim applies in this case, regardless of the financial condition of Ford. *Id*. at 15. There are several problems with this argument.

First, while Defendants aver it is the "settlor's intent" that the Ford Stock Fund in both Plans (1) was designed to invest "exclusively in Company stock," (2) was designed to be a "permanent feature of the Plan" unless and until "there is a serious question concerning the Company's short term viability as a going concern," and (3) "should be, and should continue to be invested exclusively in Company Stock . . . without regard to . . . the diversification of

38

assets . . . ," this language did not exist before 2006 – six years into the Class Period (Dkt. #73, pgs. 5, 12, 14; Compl. ¶ 195).  Before 2006 the Ford Stock Funds (but not the 401(k) Plans *in toto*) were designed to invest "primarily" in Ford stock and did not contain any references to the 'permanence' of the Ford Stock Fund feature or the circumstances under which Ford stock should be sold by Defendants (Compl. ¶¶ 30, 40).  These changes were added in May 2006 – after the Plans already had lost billions of dollars on their investment in Ford stock.  Defendants refrain that it was "settlor intent" to require exclusive investment in Ford stock throughout the Class Period, is not accurate.

Second, *Moench* notes that in overcoming the presumption of prudence, a plaintiff must show "that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." *Moench*, 62 F.3d at 571.  This was not an invitation for unscrupulous fiduciaries – fearing liability for damage already done – to rewrite plans to make it more difficult for participants to recover the plans' losses.  Rather, the point was to balance in general terms the competing ESOP concepts of employee ownership on the one hand – the settlor intent at issue – and prudent management of retirement savings on the other.  Defendants cannot undermine the need for this careful balancing through self-serving, *post facto* amendments.

Third, even if, as Defendants seek to portray it, the Plans' settlor intended throughout the Class Period for the Plans to be invested exclusively in Ford stock until Ford's "short term viability as a going concern" is called into question, i.e., bankruptcy is imminent, it is not clear that this standard meets the duty of prudence required under ERISA.  Hence, the expression of purported settlor intent must be disregarded when it conflicts with ERISA's dictates.  *Cent.*

*States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985) ("trust documents cannot excuse trustees from their duties under ERISA"); *Best v. Cyrus*, 310 F.3d 932, 935 (6th Cir. 2002) (holding trustee not limited to duties described in plan document, but must carry out ERISA fiduciary duties). A directed trustee is to follow proper directions, and certain directions can fail to qualify as proper. *Summers, 453 F.3d at 406.* The Sixth Circuit seems to share this view in *Kuper.* 66 F.3d at 1457 (rejecting argument that defendants could not be liable for investing in company stock because terms of plan required such investment).[18]

In short, the notion that Defendants could manage the investments of the Plans imprudently and disloyally because "the settlor wanted them to," (Dkt. #73, p. 15) is contrary to the Defendants' fiduciary duty under ERISA, and in particular their duty to disregard provisions of the Plans that would lead to an imprudent result. ERISA would be a dead letter if fiduciaries could simply replace the actual standards imposed by ERISA with a less onerous one of their own making. *See*, *Kuper*, 66 F.3d at 1457.

In this case Plaintiffs' allegations are sufficiently particular and concrete to avoid a need for the type or speculation or inference from an absence of any fact that was the concern of the

---

[18] *Accord Rankin*, 278 F. Supp. 2d at 878-79 (holding that the fact that a plan may require investment in company stock "will not *ipso facto* relieve the [defendants] of their fiduciary obligations to prudently invest or to diversi[f]y" and "Contrary to the Outside Directors' implication, a fiduciary is not required to blindly follow the Plan's terms. Indeed a fiduciary must also act in 'accordance with the documents and instruments governing the plan,' insofar as those documents are consistent with the provisions of ERISA.'" (citation omitted)); *see also U.S. Dep't of Labor*, Op. Ltr. No. 90-05A, 1990 WL 172964, at *3 (Mar. 29, 1990) (Dkt. #76, Loeser Decl., Ex. B) (despite plan provisions to the contrary, it is the responsibility of fiduciaries to determine, based on all the relevant facts and circumstances, the prudence of investing large percentage of plan assets in qualifying employer securities); U.S. Dep't of Labor, Op. Ltr. No. 83-6A, 1983 WL 22495, at *1-2 (Jan. 24, 1983) (Dkt. #76, Loeser Decl., Ex. C) (same).

Supreme Court in *Twombly*. *Twombly*, 127 S. Ct. at 1961.[19]  Reading the extensive allegations

in Plaintiffs' Complaint in a light favorable to them, they make plausible assertions that they are

entitled to relief.[20]

**E.    Counts II And III Should Be Sustained**.

Defendants' arguments for dismissing Counts II and III are based on their assertion that

the underlying imprudence claim of Count I is not viable.  For the reasons set forth above,

Defendants are incorrect about the underlying imprudence claim.  Accordingly, Defendants'

motion to dismiss Counts II and III should be denied as well.

The breach of the duty to monitor claim is asserted against Ford, the VP Defendants and

the Doe Defendants (the "Monitoring Defendants").  Because these Defendants had the authority

---

[19] Defendants' suggestion that the *General Motors* court's analysis of the presumption is somehow contrary to *Twombly* is not persuasive (Dkt. #73, p. 11 n.13).  *Twombly* did not replace Rule 8(a)'s notice pleading requirement with a new civil procedure that requires plaintiffs to satisfy an evidentiary burden before evidence is developed in a case.  The Supreme Court explicitly disclaimed that it was requiring "heightened fact pleading."  *Twombly*, 127 S. Ct. at 1965, 1973 n.14 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely . . . . In reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished 'by the process of amending the Federal Rules, and not by judicial interpretation.'") (citations omitted); *accord Erickson v. Pardus*, 127 S. Ct. 2197, 2199 (2007) (quoting *Twombly* and noting that, under Rule 8, pleading specific facts is not necessary because "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" (citation omitted)).

[20] Again referring to Judge Posner, he notes in *Summers* the obligation of ESOP fiduciaries "to protect the employee-shareholder against excessive risk" and he stresses how debt-equity ratio of company can be considered in evaluating whether fiduciary's continued investment in company stock is prudent under ERISA, *Summers*, 453 F.3d at 411; *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 566 (D. Md. 2003) (finding breach of the prudent man standard because of lack of appropriate consideration of investment's opportunity for gain versus risk of loss); (Compl. ¶¶ 244-246) (discussing excessive risk posed by Ford stock)).

to appoint, remove and monitor other Defendants (Compl. ¶ 256), Plaintiffs argue they had a duty to monitor them.  *AEP*, 327 F. Supp. 2d at 832-33.

The Complaint sets forth specific obligations of appointing fiduciaries (Compl. ¶¶ 256-59), describes how these obligations were breached (Compl. ¶ 260), and alleges that the Plans were damaged thereby (Compl. ¶ 261).  These allegations are adequate to state a claim for breach of the fiduciary duty to monitor.  *See AEP*, 327 F. Supp. 2d at 832-33.

Plaintiffs have also alleged co-fiduciary liability.  Co-fiduciary liability is governed by ERISA § 405(a), 29 U.S.C. § 1105(a), which imposes liability for "(1) a fiduciary's participation in, or concealment of, breaches of fiduciary duty by another fiduciary, (2) a fiduciary's enabling another fiduciary to commit a breach, or (3) a fiduciary's having knowledge of a breach by another fiduciary, and failing to take reasonable steps to remedy that breach."

Here, Plaintiffs have pled that Defendants violated all three prongs of ERISA § 405(a) because (1) they knew of Ford's failures and alleged inappropriate business practices, and of breaches by other fiduciaries, but took no action to remedy those breaches (Compl. ¶¶ 267-69); (2) with knowledge of breaches by Ford, the VP Defendants, the Executive Officer Defendants, and IPC Defendants and the IPOC Defendants (the "Prudence Defendants"), the Monitoring Defendants ignored their oversight responsibilities and thereby knowingly participated in the breaches (Compl. ¶ 270) and; (3) by not monitoring or taking other appropriate steps with respect to the Prudence Defendants, the Monitoring Defendants enabled the Prudence Defendants' breach of duty (Compl. ¶¶ 271-72).  Such allegations are sufficient to meet the Rule 8 pleading standards.  *See AEP*, 327 F. Supp. 2d at 833; *CMS*, 312 F. Supp. 2d at 910-11.

While Defendants may ultimately be able to prevail because the Plaintiffs fail to rebut the

presumption of prudence to which Defendants are entitled, the Complaint alleges sufficient facts against the "Monitoring Defendants" and the "Prudence Defendants" for the Plaintiffs to proceed. *See Harzewski v. Guidant Corp.*, 489 F.3d 799, 807 (7th Cir. 2007) (reversing district court's dismissal because plaintiffs had no opportunity to establish when fiduciary should have sold company stock from ERISA plan); *Keach v. U.S. Trust Co.*, 240 F. Supp. 2d 840, 845 (C.D. Ill. 2002) ("When viewing the facts in the light most favorable to the Plaintiffs, as the Court must at this stage of the litigation, a reasonable fact finder could conclude that following the precipitous drop in the value of the ESOP's assets in 1998, the [defendants] buried their heads in the sand and failed to take appropriate action to seek redress to recoup the loss or otherwise protect the remaining plan assets and, by virtue of this failure, fell below the standard of care required of ERISA fiduciaries."). Defendants fail to present any legitimate basis for denying Plaintiffs the opportunity to seek to discover and to present the evidence necessary to prove their factual allegations in this case. Accordingly, their motion to dismiss should be denied.

## IV.    RECOMMENDATION

For the reasons indicated above, **IT IS RECOMMENDED** that Defendants' motion be **DENIED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: March 31, 2008                             s/Steven D. Pepe
Ann Arbor, Michigan                              United States Magistrate Judge




## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing ***Report and Recommendation***  was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 31, 2008.


                                                 s/ Alissa Greer
                                                 Case Manager to Magistrate
                                                 Judge Steven D. Pepe
                                                 (734) 741-2298